In re McGRATH MFG. CO.
OF OMAHA, NEBRASKA.

In re SARGENT MACHINE CO., Inc.

In re McGRATH MFG. CO., Inc., An
Indiana Corporation.

Nos. 26–47, 27–47, 28–47.

United States District Court
D. Nebraska, Omaha Division.
March 7, 1951.

As Modified March 19, 1951.

See also D.C., 94 F.Supp. 8.

William Ritchie, Omaha, Neb., per se.

Edward G. Garvey, Omaha, Neb., per se.

James F. Green, Omaha, Neb., per se.

Bernard E. Vinardi, Omaha, Neb., for Joseph J. Vinardi.

Jack W. Marer, Omaha, Neb., for Creditors' Committee consisting of Clark, Smedal and Marer.

James F. Green, Omaha, Neb., for Robert J. Webb.

Bernard E. Vinardi, Omaha, Neb., for Martin P. Torborg.

A. E. Royce, Omaha, Neb., for Creditors' Committee consisting of Bugbee, Christensen and Kurtz.

A. E. Royce, Omaha, Neb., per se, and for Edson Smith.

William A. Sawtell, Jr., Omaha, Neb., for Creditors' Committee consisting of Morsman, Sawtell and Rothberg.

DONOHOE, Chief Judge.

On October 25, 1947, petitions were filed under Chapter X of the Bankruptcy Act[1] giving this Court jurisdiction of reorganization proceedings involving three related corporations, the parent corporation, McGrath Manufacturing Compa-

1. 11 U.S.C.A. § 501 et seq.

ny of Omaha, Nebraska,[2] and its two subsidiaries, Sargent Machine Company of Fort Dodge, Iowa,[3] and McGrath Manufacturing Company, Inc. of New Haven, Indiana.[4] At this time, all three of these corporations were in difficult financial straits. However, it was the sincere belief of those concerned that an acceptable plan of reorganization could be engendered which would give vitality to the failing businesses. While such a plan was being formulated, trustees were appointed to preserve the debtors' assets. In order to save the going concern value of the businesses, which is one of the primary purposes of corporate reorganizations under Chapter X, attempts were made to continue operations for the debtors. These attempts, for the most part, were in vain. In saying this, we do not mean to overlook the fact that the mere conservation of the corporate properties, in itself, has proven profitable because of the rapid increase in prices since the institution of these proceedings. Nor can we lose sight of the fact that the debtors have preserved a right to certain royalties which, except for this action, would have been lost.[5] These factors, however, were merely incidental to the rehabilitation endeavor. Consequently, since

it is now apparent that liquidation must follow as a matter of course, we may, in fairness, say that the effort to reorganize was a failure.[6] This observation is not made in reprehension of those who participated in these proceedings, but merely to indicate that the venture proved neither successful nor profitable.

In winding up the affairs of the bankrupt corporations, this Court is called upon to allow and sanction as reasonable the compensation requested by those who gave of their time and skill to the reorganization effort. This is a matter deserving very serious consideration if the policies of the Bankruptcy Act are to be efficaciously carried out. Before analyzing in detail the individual claims, the Court deems it wise to point out certain matters of a general nature which have been taken into consideration in fixing all the allowances.

This particular proceeding has been a tedious and drawn out affair, extending over a period in excess of three years. The problems involved herein were not merely the business problems of a single corporation, but the problems of three distinct, yet interrelated concerns, all having separate assets and liabilities. This par-

2. Hereinafter referred to as McGrath of Nebraska.

3. Hereinafter referred to as Sargent of Iowa.

4. Hereinafter referred to as McGrath of Indiana.

5. The debtors preserved a right to a 5% royalty on each corn harvester manufactured by the Food Machinery Company. Theoretically, under the terms of the contract, the debtors could receive up to $700,000. As a practical matter, in view of the number of machines manufactured and sold annually by the Food Machinery Co., the debtors will probably never receive anywhere near this amount.

6. The constructive purposes of reorganization may be summarized as follows:
 1) to facilitate recapitalization, Case v. Los Angeles Lumber Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110;
 2) to rearrange rights in the property of the debtor, Herbert V. Apartments Corp. v. Mortgage Guaranty Co., 3 Cir., 98 F.2d 662;

 3) to get a debtor out of court duly reorganized in as short a time as possible, In re Los Angeles Lumber Products Co., D.C., 46 F.Supp. 95;
 4) to provide relief against a recalcitrant minority group of creditors, Campbell v. Alleghany Corp., 4 Cir., 75 F.2d 947;
 5) to preserve going-concern values so that they will be available for payment of claims against the debtor and for protection of its interest, In re Island Park Associates, 2 Cir., 77 F.2d 334;
 6) to enable debtors to reach creditors whose identities were often concealed by bond houses and bankers, In re Allied Owners' Corporation, 2 Cir., 74 F.2d 201, 97 A.L.R. 360; and
 7) to provide a concourse where all groups of creditors and shareholders may establish their rights without the dismemberment occasioned by other remedies. 11 Remington on Bankruptcy, Sec. 4345, p. 16. In the present case a very few, if any, of these objectives have been properly attained.

ticular proceeding was, prior to consolidation, three proceedings; consequently many court officers have been appointed to conserve the assets of the bankrupt estates. There were three trustees, one for each corporation. These trustees were authorized to consult competent counsel concerning the legal effect of certain contemplated action—a necessary precaution where large sums of money are involved. In addition to the trustees and their attorneys, there were three creditors committees and their attorneys serving the insolvent debtors. And last, but by no means least, there was created the reorganization committee, the prime force in bringing this extended proceeding to a fitting climax.

All the men who served as court officers in this matter are well known for their ability and highly respected for their integrity. The court was indeed fortunate to have had such capable assistance. We must remember in this regard, however, that as court officers, we are public servants, and our compensation should never be as large as that of those engaged in private employment. In re National Department Stores, D.C., 11 F.Supp. 633, affirmed 3 Cir., 93 F.2d 127.

In general, the Court, is not disposed to quibble over the items set forth in the claimants' time schedules. This is especially true where such time schedules have been set up in accordance with the suggestions made in the In re National Accessories Case, D.C., 13 F.Supp. 278. In this regard, it may be well to point out that where meticulous care has been taken in itemizing the services for which compensation is requested, verification of the account stated by the court officer is a simple matter. Where, however, the claim for compensation is a general one, vague and all inclusive, verification becomes an impossible task. The court is aware, in a general way, of the time that has been consumed on the affairs of these related corporations since the initiation of this action. Much of this time was spent pursuant to this Court's express direction. Consequently we are reluctant to say that any of it, if properly itemized and actually rendered, was needless or wasteful. We believe that work was done and compensation is due. It is important that trustees and their attorneys receive a reasonable compensation for their services. Cf. In re 2747 Milwaukee Avenue Building Corp., D.C., 12 F. Supp. 557; In re National Accessories, supra. This compensation, however, is not solely dependent upon the time involved. The court must also consider the size of the debtor's estate, the amount at stake, the difficulty of the task undertaken by the court officer, and finally, the results achieved. In re Burrus, D.C., 97 F. 926; In re Osofsky, D.C., 50 F.2d 925.

It is clear that if social and economic good is to be accomplished, reorganization must result in benefits to the distressed debtor, its creditors and stockholders. To effect this, the expense of reorganization must bear a proper relation to the advantage gained. In re Memphis Street Ry. Co., D. C., 11 F.Supp. 682. In the present case the requested allowances total almost $115,000. The funds available for distribution will probably not exceed $350,000.[7] The claims of creditors are far in excess of this sum. As has been suggested heretofore, very little has been accomplished insofar as rehabilitating the debtor is concerned. The creditors are in no better position now than they were in 1947, except to the extent that the processing of claims has eliminated unnecessary litigation. Under these circumstances, does it seem fair that the court officers should be entitled to approximately one-third of the assets now available for distribution? We must remember that the Bankruptcy Act is designated an "act for the relief of debtors" and, inferentially, not an act for the relief of attorneys and court officers. In re Wayne Pump Co., D.C., 9 F.Supp. 940, 942.

With these considerations in mind, the court finds it necessary to reduce, to some extent at least, the allowances requested. The amount of the reduction, and converse-

7. This figure is an estimate of the consolidated trustee and does not include money which may be recovered under the royalty contract mentioned in note 5, supra.

ly the amount of the allowance must necessarily depend upon the merit of the individual claim.

### Claim of Edward G. Garvey.

■ Edward G. Garvey was the duly appointed trustee of the debtor, McGrath Manufacturing Company of Omaha, Nebraska. He has received an interim allowance of $7,500 for services rendered in that capacity during the period from October 25, 1947, to October 15, 1948. He is now seeking compensation for the period beginning October 15, 1948, and ending November 15, 1950. The time schedule which he has filed shows that he has expended 738 hours on particular matters in connection with the debtor's estate. In addition to this, he adds 462 hours "as a most conservative estimate of time spent upon matters for which no time is included (in the time schedule)". While the court frowns on estimates, conservative or otherwise, it is clear that Mr. Garvey has actually expended the time for which he seeks compensation. Mr. Garvey is asking for $19,000 for his 1,200 hours of labor. This amounts to a little more than $15 an hour or a little less than $130 a day. The court is of the opinion that, in this case, where the assets available for distribution are so limited, the compensation for the routine matters of administration should not exceed $10 an hour. It should be noted in regard to his request that Mr. Garvey has been meticulous in handling the affairs of McGrath of Nebraska. He has collected and distributed almost $1,000,000, which included the collection of over $45,000 of the debtor's delinquent accounts. He has been overseer of the extended operations carried on by McGrath of Nebraska during the course of these proceedings. It is true that the operating statements of McGrath of Nebraska show a substantial loss but, as Mr. Garvey points out, the actual economic loss was negligible. Consequently $12,000 ($10 an hour) is the very minimum which we could ask Mr. Garvey to accept for the routine matters he has handled as trustee.

In addition to his compensation for routine acts as trustee we feel that Mr. Garvey is entitled to $3,000 for services rendered as attorney for the debtor. In many situations Mr. Garvey has been called upon to use his expert skill as an attorney for the benefit of the debtor. Mr. Garvey prepared and filed many of the pleadings and notices in this action himself. In addition to this, he was called upon to defend, and was instrumental in bringing to a settlement, the Morrill patent case. If it were not for the condition of the debtor's estate, the court would feel obliged to give greater compensation to Mr. Garvey for his efforts in this matter. However, in view of what has been pointed out in the introduction to this memorandum, the court is constrained to hold that $15,000 would be a reasonable compensation in this case for the services rendered by Mr. Garvey during the period between October 15, 1948, and November 15, 1950.

### Claim of James F. Green.

■ James F. Green was the duly appointed trustee of the debtor, McGrath Manufacturing Company, Inc., of New Haven, Indiana. He is seeking compensation for services performed by him during the period from October 25, 1947, to November 15, 1950. As nearly as the court is able to determine from his time schedule, Mr. Green has consumed approximately 1,185 hours in performing his duties as trustee. The greater portion of his duties were routine in character.

McGrath of Indiana was not a manufacturing corporation, but a sales organization operated primarily for the benefit of the two affiliated debtors, McGrath of Nebraska and Sargent of Iowa. With the institution of these reorganization proceedings the function of McGrath of Indiana became considerably limited. Mr. Green went immediately to New Haven, and made drastic cuts in operating personnel. His next move was to dispose of the debtors stock in trade, including, among other things, certain raw materials, a few power mowers and wheelbarrows. Within a year this was taken care of and the sales organization was almost inoperative. However, Mr. Green's duties con-

tinued beyond this period. He was responsible for the conservation of the debtor's assets and he had to take care of other routine matters, such as handling and presentation of claims.

There were features in connection with the affairs of the debtor which this court considered by no means routine. The Lincoln National Bank and Trust Company had a substantial lien on the debtor's assets and threatened litigation to enforce its lien. Several intricate legal questions arose. Mr. Green applied to this court for appointment of special counsel to handle this matter; and the court appointed Robert J. Webb, as special counsel to the trustee. Mr. Webb was very successful in bringing the threatened litigation with the Lincoln National Bank and Trust Company to a peaceful and satisfactory settlement. Another feature of the administration of the debtor's estate which cannot be considered routine was the sale of the Indiana plant for $185,000. Mr. Green deserves a great deal of credit for the masterful way in which he handled this sale. However, it should be noted in this regard, that Mr. Webb also gave limited counsel in this sale, advising the trustee as to the status of the secured claims of the Lincoln National Bank and Trust Company.

In several instances Mr. Green acted as attorney on behalf of himself as trustee. But those instances, in general, involved only routine matters.

Considering the condition of the debtor's estate, the assistance given to Mr. Green by Mr. Webb, for which the court will be required to compensate Mr. Webb, considering the nature of the work done by Mr. Green and the results accomplished, the court concludes that $10 an hour would be fair and reasonable compensation. Therefore Mr. Green will be allowed $11,850 as compensation for services rendered in the capacity of trustee of McGrath Manufacturing Company, Inc. of New Haven during the period from October 25, 1947, to November 15, 1950.

## Claim of Joseph J. Vinardi.

Joseph J. Vinardi was the duly appointed trustee of the Sargent Machine Company of Fort Dodge, Iowa. He is seeking compensation for services rendered in that capacity during the period beginning October 25, 1947, and ending November 15, 1950.

It is extremely difficult to ascertain exactly how much time Mr. Vinardi has consumed in carrying out his duties as trustee. The time schedule which Mr. Vinardi has filed with his application contains entries on each of six hundred different days. This is very little help to the court because Mr. Vinardi could have expended anywhere from five minutes to eight hours in connection with the particular transaction for which an entry is made. The Court could estimate the time necessary for a particular transaction, but this would prove unsatisfactory for many reasons. We may best expose the unsuitable nature of such estimates by a simple illustration. In Mr. Vinardi's time schedule we find the following entry for March 22, 1950:

"Letter from Royal Typewriter Co., re claim."

How much time did it take Mr. Vinardi to process this letter? We notice the entry for March 27, 1950, is as follows:

"Letter to Royal Typewriter Co., Inc., re status; Conference with Mr Cady, re payroll."

There are over twenty-five instances in which the only entry for a particular day is the receipt of a letter; and almost as many instances in which the only entry for a particular day is the response to a letter. This Court is not in a position to estimate how much time such transactions consume.

In almost one-hundred fifty instances the following entry appears in the time schedule:

"Conference with Mr. Cady, re payroll."

In many of such instances the conference is the only entry for the particular day. How much time would a conference with Mr. Cady in regard to the payroll take? Did it take the same amount of time

at the first conference as at the last? Here again, this court is not in a position to judge, and is somewhat reluctant to hazard a guess. It would have been a simple matter for Mr. Vinardi to have kept accurate accounts with reference to the time consumed; and this court has requested court officers to do so. In re National Accessories, supra.

Mr. Vinardi is seeking compensation for two-hundred and one full days. The court has concluded that his time schedule does not substantiate his claim in this regard. If we were to allow Mr. Vinardi credit for one-fourth day for each day for which an entry has been made in his time schedule, he would be entitled to compensation for one-hundred fifty full days. In view of the condition of his time schedule the Court is of the opinion that this is a very liberal allowance.

 Mr. Vinardi deserves high praise for his prudent handling of the debtor estate during the period in which it carried on certain manufacturing operations. But as has been pointed out heretofore, the assets available for distribution are limited, and the results accomplished have not been great. This is as true of the work done by Mr. Vinardi as it is of the work done by others. Consequently the Court is constrained to hold that $10 an hour, or a total compensation of $12,000 ($80 a day for 150 days) would be reasonable compensation for the services rendered by Mr. Vinardi as trustee of Sargent of Iowa between October 15, 1947, and November 15, 1950.

### Claim of William Ritchie.

William Ritchie is seeking compensation as attorney for each of the three trustees, Edward G. Garvey, trustee of McGrath of Nebraska, James F. Green, trustee of McGrath of Indiana, and Joseph J. Vinardi, trustee of Sargent of Iowa. Before considering his claim, the Court deems it necessary to mention the nature of his interest in the consolidated debtors and the events leading up to his appointment as counsel for the trustees.

In 1946, Mr. Ritchie first came in contact with the consolidated debtors when he was called upon to assist in collecting a claim which McGrath of Nebraska had against the Randall-Carpenter Paper Company of St. Paul, Minnesota. For services rendered in this matter, he received a fee of $850. Some time later he was called upon to amend the articles of incorporation of the debtor, Sargent of Iowa. His fee of $500 for this work remains unpaid and is now a general claim against the debtor's estate. Mr. Ritchie's most extensive efforts on behalf of the debtors occurred during certain tripartite negotiations between the debtors, the Midwest Company and the Food Machinery Company. The Midwest Company claimed letters patent for the invention of a certain type of corn harvester. Mr. Ritchie, incidentally, had represented the Midwest Company in its endeavor to procure an early allowance of the letters patent. He also represented the debtor corporations in negotiations with the Midwest Company which led to a contract for the manufacture by Sargent of Iowa of 500 corn harvesters. The corn harvesters, the type for which Midwest claimed letters patent, were to be manufactured in a plant owned by McGrath of Indiana. So that he could assist the associated companies in carrying out the before-mentioned contract, Mr. Ritchie was requested by Mr. McGrath, sole stockholder of the parent company, McGrath of Nebraska, to become a director of this company. Mr. Ritchie obliged. On October 16, 1947, while Mr. Ritchie was participating in a director's meeting, he became aware, for the first time, of the exceedingly deficient financial condition of the associated companies.[8] The incident giving rise to this sudden awareness was a remark by Mr. McGrath to the effect that the companies did not have sufficient funds to complete machines which had already been contracted for, or for which a down payment had been made. Because he felt

---

8. Prior to this time Mr. Ritchie knew that the debtors were in poor financial condition, but his testimony leaves the impression that it was not until this director's meeting that he actually found out how bad that deficient condition really was.

that bankruptcy, or a related type of proceeding, was imminent, Mr. Ritchie flew to San Jose, California, to complete certain negotiations, which had been pending, with the Food Machinery Company. It seems that the Food Machinery Company was interested in leasing the plant owned by McGrath of Indiana for the purpose of manufacturing the corn harvester patented by the Midwest Company. Mr. Ritchie attended to the proper execution of the lease, giving the Food Machinery Company an option to buy the Indiana Plant. In addition to this, he negotiated and had executed a contract whereby McGrath would receive a 5% royalty on every corn harvester manufactured by the Food Machinery Company. The total royalties received by McGrath could not, by the terms of the contract, exceed $700,000. Mr. Ritchie's fee for negotiating this contract was to be 5% of the amount received by McGrath under the contract. He has filed a claim for that amount and this claim has been allowed in full. He can receive up to $35,000 on this claim depending on the number of corn harvesters manufactured by the Food Machinery Company, and the royalties paid to the debtors.

When the negotiations for execution of the lease and contract between the debtors and the Food Machinery Company had been completed, Mr. Ritchie returned to Omaha, and advised the directors of the associated companies that the only recourse open to them was reorganization under Chapter X of the Bankruptcy Act. His suggestion was accepted, though not without opposition from some of the stockholders.

At this time there appears to have been a problem in regard to who would represent the debtor corporations as attorney in the Chapter X proceedings. This is a little puzzling to the court in view of Mr. Ritchie's conduct prior to this time. He had done a very excellent job as attorney for the debtors, and there is no apparent reason, insofar as the record discloses, why he should not have continued to do so. He points out that the problem arose because Mr. Fradenburg, who was, in name, general counsel for the debtors, was also referee in bankruptcy and could not ethically serve in a dual capacity. In this regard the court would like to point out that it was not Mr. Fradenburg, but Mr. Ritchie who negotiated with Midwest for the corn harvester contract; it was not Mr. Fradenburg, but Mr. Ritchie who amended the articles of incorporation for Sargent of Iowa; it was not Mr. Fradenburg, but Mr. Ritchie who flew to San Jose, California, to complete negotiations for the lease of the Indiana plant and the royalty contract; and finally, it was not Mr. Fradenburg, but Mr. Ritchie who advised these Chapter X proceedings. It is difficult for the court to visualize that Mr. Fradenburg was, in truth and in fact, counsel for the debtors, when it was Mr. Ritchie who made the crucial decisions in the time of greatest difficulty. The court is at a loss to understand, why, on the 24th of October, the day before these proceedings were filed, Mr. Ritchie, who had done such a magnificent job of representing the debtors, stated to the board of directors: "Well, you have to have an attorney for the company. I cannot act as attorney and don't propose to."

In view of this renouncement, and pursuant to Mr. Ritchie's suggestion, Mr. Ross King was called upon, presumably to represent the debtor corporations in the Chapter X proceedings. However, it was not Mr. King, but Mr. Ritchie, who had considerable experience in Chapter X proceedings; it was not Mr. King, but Mr. Ritchie who was acquainted with the condition of the three insolvent corporations; it was not Mr. King, but Mr. Ritchie who suggested the trustees; and finally it was not Mr. King, but Mr. Ritchie who dictated and had prepared the three petitions for reorganization. Mr. King performed only one, single, solitary function as attorney for the debtors. He placed his signature on the reorganization petitions.

On October 25, 1947, the reorganization petitions were filed. These petitions were presented to Judge Delehant for approval in the absence of the Judge now presiding, who was at that time assigned to the Southern District of New York. When the petitions were filed, Mr. Ritchie represented to the court that approval of the

petitions should be entered immediately because, in this particular case, time was of the essence if the reorganization efforts were to prove successful. On this very same day, the following events occurred: Orders were entered approving the petitions. The trustees were appointed and bonds were filed. All three of the trustees filed applications for the appointment of William Ritchie as their attorney. This court entered orders appointing Mr. Ritchie "as counsel" for each of the trustees. At the time these orders were entered there was not on file any showing, either by the trustees, or by Mr. Ritchie, himself, of the nature of his interest in the debtor corporations.

 That the orders of October 25, 1947, appointing William Ritchie, as counsel for the trustees, were ill advised became readily apparent. Chapter X of the Bankruptcy Act was aimed at "democratization" of reorganization proceedings in the sense that it encourages the more active participation of creditors and stockholders, and in various ways insures that the reorganization will not be dominated by and manipulated in the interest of the reorganizers. House Report No. 1409 on H.R. 8046, 75 Cong., 1st Sess. (1937) 41–48, cited in 6 Collier on Bankruptcy, Sec. 0.08, p. 85. One of the primary safeguards against domination is the requirement of Section 156 of the Act, 11 U.S.C.A. § 556, that the trustee be disinterested. It would be anomalous to require a trustee to be aloof from all connection with the debtor or its management, yet permit the trustee's attorney, who would necessarily be active in furthering the trustee's duties of investigation, management, prosecution, development of plans and the like, to have a close relationship with the debtor. See 6 Collier on Bankruptcy, Sec. 7.06, p. 1998, fn 3. This was the reason for the enactment of Section 157 of the Bankruptcy Act, which provides: "An attorney appointed to represent a trustee under this chapter shall also be a disinterested person: Provided, however, That for any specified purposes other than to represent a trustee in conducting the proceeding under this chapter the trustee may, with the approval of the judge, employ an attorney who is not disinterested." 11 U.S.C.A. § 557.

That Mr. Ritchie was not disinterested is clear. Section 158 of the Bankruptcy Act provides:

"A person shall not be deemed disinterested, for the purposes of sections 156 and 157 of this Act, if—

"(1) he is a creditor or stockholder of the debtor; or

"(2) he is or was an underwriter of any of the outstanding securities of the debtor or within five years prior to the date of the filing the petition was the underwriter of any securities of the debtor; or

"(3) he is, or was within two years prior to the date of the filing of the petition, a director, officer, or employee of the debtor or any such underwriter, or an attorney for the debtor or such underwriter; or

"(4) it appears that he has, by reason of any other direct or indirect relationship to, connection with, or interest in the debtor or such underwriter, or for any reason an interest materially adverse to the interest of any class of creditors or stockholders." 11 U.S.C.A. § 558.

 Under the foregoing provisions of the law, Mr. Ritchie, a creditor of two or more of the debtors, a director of one or more of the debtors, and an attorney for all three of the debtors, was not a disinterested person. Consequently he was not qualified to represent the trustee in the conduct of the reorganization proceedings and this court could not authorize his employment in that capacity.

The trustees evidently became aware of the requirement of disinterestedness because all three of them filed new applications for the appointment of William Ritchie, as counsel. Each application was filed November 13, 1947, and contained a statement of the nature of Mr. Ritchie's interest in the corporate debtors, and attached to each application was the affidavit of Mr. Ritchie verifying the statement. The court notices, for whatever significance it may have, that neither the applications nor the affidavit of Mr. Ritchie disclosed fully the service rendered by him in preparing the petitions for reorganization.

On November 14, 1947, this court modified its orders of October 25, 1947, by authorizing the employment of William Ritchie as attorney for the trustees only "for the purpose of advising said trustee in the conduct of the business and management of the affairs of said debtor corporation, when called upon to do so."

■ These orders did not authorize the employment of Mr. Ritchie to represent the trustees in the conduct of the Chapter X proceedings. Because he was not disinterested, this court could not have authorized such employment. The orders did, however, properly authorize the employment of Mr. Ritchie for the handling of certain business matters, such as the leasing of property and the collection of accounts, etc. That the court could properly authorize such services by an attorney, who is not disinterested, seems clear. Cf. In re Mortgage Guarantee Co., D.C. Md. 1941, 40 F.Supp. 226; Corporate Reorganizations: Changes effected by Chapter X of the Bankruptcy Act, 52 Harv.L.R. 1, 11–12. In addition to expressly delineating the purposes for which Mr. Richie could be employed, the orders entered November 14, 1947, affixed a condition to Mr. Ritchie's right to be compensated. The orders stated: "* * * that said William Ritchie shall be compensated on a basis to be fixed by the Court, on statements *which shall be rendered quarterly* to this Court and approved by this Court before payments thereon are made, this to include such expenses as the said William Ritchie shall reasonably and prudently incur in connection with his handling of the affairs of said Debtor in an advisory capacity to the Trustee, or in conducting any litigation incident thereto." (Emphasis added.)

On September 21, 1950, almost three years after the above quoted orders were entered, Mr. Ritchie, without ever having rendered the quarterly statements as required, filed his application for compensation. The application, as amended, indicates that $17,433.70 would be a reasonable compensation for services rendered by himself and his associate, one Bernard E. Vinardi, as attorneys for the trustees. Mr.

Royce, on behalf of one of the creditors committees, has filed objections to the allowance of this claim. The objections seem to be well taken.

The services rendered by Mr. Ritchie, and his associate Mr. Vinardi, as shown by the transactions listed in the time schedules of each may be summarized as follows:

a) Services rendered on behalf of the debtor corporation in the preparation of the petition for reorganization.

b) Services rendered on behalf of the trustees, at their request.

1) Representing the trustees in the conduct of the Chapter X proceedings.

2) Advising the trustees in the conduct of the business and management of the affairs of the debtors.

c) Services rendered as a member of the reorganization committee.

■ Before discussing the compensability of the services rendered, the court should like to point out that Mr. Bernard Vinardi was not appointed by any order of this court as attorney for the trustees. It is a general rule that an attorney who acts for a trustee, or in behalf of a trustee, without compliance with General Order 44, 11 U.S.C.A. following section 53, and without appointment by the judge, will be denied any compensation, even though valuable services were rendered in good faith. In re Progress Lektro Shave Corp., 2 Cir., 117 F.2d 602; Gochenour v. Cleveland Terminal Bldg. Co., 6 Cir., 142 F.2d 991.

■ Mr. Bernard Vinardi has not filed an application in his own right for compensation, but claims only through Mr. Ritchie. There would be very little purpose in requiring the attorney, appointed to represent the trustee, to satisfy the court that he has special skills and qualifications, and that he is a disinterested person, if after his appointment as attorney for the trustee, he could assign the work to whomever he pleased. The assignee, the one actually rendering the services, might have none of the required qualifications. This court cannot condone action which manifestly tends to frustrate the requirements of the Bankruptcy Act.

836

In any event, what the Court has to say in regard to the compensability of the services rendered by Mr. Ritchie, applies equally well to the services rendered by Mr. Vinardi, since he can claim compensation, if at all, only through Mr. Ritchie.

a) Mr. Ritchie is entitled to compensation for services rendered in behalf of the debtor corporations by preparing the reorganization petitions. The time schedule which he has filed indicates that it took only a day to prepare these petitions. However, in view of his special skill in bankruptcy matters, and because of his peculiar understanding of the affairs of the debtors, the court is of the opinion that Mr. Ritchie should be allowed $1,000 as reasonable compensation for preparing the three reorganization petitions.

b) The Court has concluded that Mr. Ritchie is not entitled to any compensation for services rendered on behalf of the trustees.

1) A very substantial portion of the time for which Mr. Ritchie claims compensation was consumed in representing the trustees in the conduct of the proceedings. In his application for compensation Mr. Ritchie alleges:

"Some of the services rendered by the said William Ritchie include the following:

"(a) an extensive amount of work in connection with the pleadings and proceedings as each of the above entitled cases were progressing.

"(b) numerous conferences with the Trustees and others pertaining to the above entitled proceedings, the status and position of each of the Debtors and the various rights and obligations of each of the debtors.

\* \* \* \* \* \*

"(h) a large number of pleadings in each of the cases were prepared in the office of this Applicant.

"(i) all pleadings and orders obtained in each of the proceedings were served upon the attorneys of each of the three committees, as required by law, by members of the Petitioner's legal staff."

The time schedules filed by Mr. Ritchie in support of his application indicate that a considerable amount of time was consumed in representing the trustees in the conduct of the Chapter X proceedings. This is especially true in regard to the work done by Mr. Bernard Vinardi. As has been pointed out heretofore, Mr. Ritchie is not entitled to compensation for services rendered in this capacity for two reasons. First, the court could not appoint Mr. Ritchie, who was not disinterested, as attorney to represent the trustee in the conduct of the proceedings. 11 U.S.C.A. §§ 557, 558, Matter of Progress Lektro Shave Corporation, supra. Second, the orders of this court entered November 14, 1947, did not in fact appoint Mr. Ritchie for such purposes.

2) As to the time which Mr. Ritchie expended in giving the trustees advice in regard to the conduct of the business and the management of the affairs of the debtors, this is likewise not compensable. Mr. Ritchie has failed to delineate the time consumed in this manner with sufficient clarity to afford the court any reasonable basis for compensation. The Court is unable to discern how much of the 68 days devoted by Mr. Ritchie, or the 1,700 hours devoted by Mr Bernard Vinardi, in this matter, constitutes time expended solely in regard to the management of the business and affairs of the debtors as contradistinguished from time expended representing the trustees in the conduct of the Chapter X proceedings.

But aside from the vagueness of Mr. Ritchie's claim in this regard, there is a much stronger reason why he is not entitled to compensation. By failing to render quarterly statements to this Court, he has deliberately disregarded the orders of Judge Delehant entered November 14, 1947. Mr. Ritchie seems to indicate that something which I may have said in regard to fees and allowances relieved him of his responsibility to render quarterly statements. But, he admits that he had never called Judge Delehant's orders to my attention; and, when asked if he contended that the orders had been modified or amended, Mr. Ritchie replied: "No,

I am just stating why I did not file them (quarterly statements), and I don't think that was important or essential."

At a later point in the proceedings Mr. Ritchie was questioned as to the difference in his employment under the two sets of orders entered by Judge Delehant. After making it clear that he was entitled to compensation, Mr. Ritchie announced: "If you want to know my honest opinion, I don't think those orders are worth the paper they are written upon, except that they show the Court knew we were going to be asked to do things and they considered it proper."

Without delving into the propriety of an attorney making such statements to one judge concerning the orders entered by another judge, the court would like to illustrate the wisdom and prudence underlying Judge Delehant's orders requiring the rendition of quarterly statements. If Mr. Ritchie had rendered and filed the first statement three months after his employment was authorized, the creditors committee would have had an opportunity to file objections to it. The whole matter could have been settled at that time. Mr. Ritchie's employment would have been properly delimited and his compensation insured. If Mr. Ritchie were not qualified to act in certain matters, it might have been possible to have had Mr. Vinardi properly appointed, if he could qualify, to represent the trustees. But Mr. Ritchie waited until almost three years after these orders were entered and then filed a request for $17,000. Who is at fault for his own disregard of this court's order? Certainly not the creditors committee now objecting to his claim. In view of his failure to meet the conditions of the order, Mr. Ritchie will be denied all compensation for services rendered to the trustees.

c) The time consumed by Mr. Ritchie as Chairman of the reorganization committee, has at the request of the reorganization committee been withdrawn from consideration in connection with Mr. Ritchie's general claim for compensation and will be considered in connection with the application for compensation filed by the reorganization committee.

### Claim of Martin P. Torborg.

Martin P. Torborg was appointed by this Court as local attorney to represent two of the trustees in matters arising in New Haven, Indiana. He has set out with meticulous care the services which he has rendered to the trustees and the benefits resulting therefrom. Mr. Torborg is to be complimented for preparing his claim in strict compliance with the National Accessories Case, D.C., 13 F.Supp. 278. Since Mr. Torborg has requested only $10 an hour for services rendered, the court feels obliged to grant his claim in full.

Mr. Torborg is entitled to $4,327.08, as reimbursement for expenses and compensation for services rendered to the trustees during the period from October 25, 1947, to November 15, 1950.

### Claim of Robert J. Webb.

Robert J. Webb was appointed as special counsel to James F. Green, trustee of McGrath of Indiana, to advise and represent the trustee in all matters arising out of transactions of said debtor, McGrath of Indiana, involving the Lincoln National Bank and Trust Company of Fort Wayne, Indiana. Mr. Webb has made a substantial contribution of his time to this matter. However, as has been pointed out before, the funds available for distribution are limited. The results accomplished by the reorganization in general, and by Mr. Webb's efforts in particular, have not been great. Consequently his request for $2,500 cannot be allowed in full. Considering the nature of the services rendered by Mr. Webb, the time employed, the difficulty of the task and the results accomplished, the Court is of the opinion that $2,000 would be a reasonable fee for the services rendered.

### Claim of Creditors Committees.

1. The Creditors Committee, consisting of George H. Clark, Carl A.

Smedal and Jack W. Marer, has actively functioned since January of 1948. This committee consumed 379 hours in discharging its obligation to the creditors it represented. Sixty-seven of those hours represent time spent in court. The committee requests $200 a day for the time in court and $12.50 an hour for all other time. Though their time might be worth that much in many situations, the court feels obliged in this case to reduce their compensation to $10 an hour. The condition of the debtors' estates just will not allow such remuneration as $200 a day. We must bear in mind that the "court time" in this case has not been particularly trying, where there were so many of us present to help each other. The court concludes that $3,790 would be a reasonable compensation for the services rendered by this creditors committee. The committee should also receive $547.13 to reimburse them for expenses reasonably incurred to discharge their obligations.

 2. The creditors committee consisting of H. B. Bugbee, E. B. Christensen and Edward H. Kurtz is asking for compensation of $10 per month per member. The court is constrained to hold that this is not excessive in view of the hourly wage of $10 allowed to many others. It is apparent from the work done by this committee that the individual members averaged more than one hour a month in discharging its obligations to the debtor. This committee should be allowed $1,080 as reasonable compensation for services rendered, and in addition to this, $132.65 as reimbursement for expenses.

A. E. Royce and Edson Smith have filed an application for compensation as attorneys for the creditors committee. Mr. Royce's effort alone, in objecting to the Ritchie claim, has saved the creditors $16,000. Consequently Mr. Royce and Mr. Smith are entitled to the fee requested and should be allowed the sum of $1,518.72, as compensation for services.

3. The creditors committee of Edgar M. Morsman, III, William A. Sawtell, Jr., and Sol Rothberg, request $9,000 for services rendered. The application indicates that Mr. Rothberg consumed over 2,000 hours in handling the affairs of the committee, and that Mr. Morsman and Mr. Sawtell expended in excess of 1,000 hours. In other words, the committee, as a group, spent an average of 1,000 hours on the affairs of the debtors' estates. This seems to be more time than would be reasonably necessary considering the results accomplished. Since Mr. Rothberg has failed to submit any kind of a time schedule, the committee has not properly substantiated its claim for an average of 1,000 hours. Consequently the court will allow the committee compensation for an average of only 750 hours at the rate of $10 an hour. This committee is entitled to $7,500 as compensation for services, and $661.16 as reimbursement for expenses.

### Claim of the Reorganization Committee.

The claim of the reorganization committee should be allowed in full, as follows:

William Ritchie...................$1,500
A. E. Royce..................... 1,500
Jack W. Marer.................. 1,500
Edward G. Garvey.............. 1,500
William A. Sawtell, Jr............. 2,500