Lewis J. RUSKIN, Collateral Trustee,

v.

Charles H. GRIFFITHS, Trustee in Reorganization.

No. 219, Docket 25317.

United States Court of Appeals
Second Circuit.

Argued March 11, 1959.

Decided Aug. 26, 1959.

828

Washington, Circuit Judge, dissented in part.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Ruskin & Rosenbaum, Chicago, Ill. (Simon H. Rifkind, New York City, Harry H. Ruskin, Chicago, Ill., John E. Massengale, New York City, Irving Younger, Forest Hills, N. Y., of counsel), for appellant, Lewis J. Ruskin.

Frederick P. Close, White Plains, N. Y. (Martin Drazen, White Plains, N. Y., of counsel), for Trustee in Reorganization, appellee.

Louis J. Weinshenker, New York City (Edward A. Gorenstein, Walter Goodman, Chicago, Ill., of counsel), for Richard Goodman, stockholder.

Richard Goodman, pro se.

Thomas G. Meeker, General Counsel, David Ferber, Asst. General Counsel, Pace Reich, Washington, D. C., Melvin Katz, Attorneys, SEC, Chicago, Ill., Richard V. Bandler, Special Counsel;

Kiva Berke, New York City, Attorney, for Securities and Exchange Commission.

Before WASHINGTON, WATERMAN, and MOORE, Circuit Judges.

WATERMAN, Circuit Judge.

On May 19, 1954 Lewis J. Ruskin, his wife, and the Rexall Drug Company sold all the stock of a retail drug store chain known as Ford Hopkins Company to General Stores Corporation. The purchase price was $2,800,000, of which $735,000 was to be paid in cash and the balance by notes to Ruskin and Rexall payable in installments until 1964. As security for these notes all the stock of Ford Hopkins and all the stock of Stineway Drug Company, another drug store chain owned by General Stores, was transferred to Ruskin as trustee for himself and for Rexall under a "Collateral Agreement" entered into simultaneously with the execution of the notes. Ruskin, as trustee under this agreement, had the right to elect a majority, or, after default, all the members of the Boards of Directors of these corporations. The notes were to accrue interest on principal at the rate of 4% per annum, but the collateral agreement provided that in case of an "event of default" as defined in that agreement the then total unpaid amount could be declared due and payable forthwith, and interest would then accrue upon overdue payments at the rate of 6% rather than at 4%. One "event of default" provided for in the agreement was as follows:

"[I]f any proceedings before Control Date involving General or any subsidiary (other than Ford of Stineway) thereof or any successors thereto, and after Control Date involving General, Ford or Stineway or any subsidiary thereof or successors thereto, are commenced by or against such company under any bankruptcy, reorganization, arrangement, insolvency or readjustment of debt, dissolution or liquidation law or statute of the Federal Government or any state government, * * *; then, in any such event, the holder or holders of any of the Notes then outstanding or the Trustee may, at their or his option, declare such Notes to be, and thereupon such Notes shall become, forthwith, due and payable * * * ".

The agreement also provided that the trustee was to be entitled to "reasonable compensation" for all the services he might render in the execution of the trusts and, in connection therewith, for his attorneys and counsel. This compensation was to constitute a prior lien on the trust estate and on all funds in the hands of the trustee.

In October 1954 the debtor, General Stores, filed a petition for arrangement under Chapter XI of the Bankruptcy Act, 11 U.S.C.A. § 701 et seq. However, instead of accelerating the debt because of this petition, Ruskin entered into a standby agreement with debtor, dated November 1, 1954, wherein he agreed that unless certain specified conditions occurred he would not foreclose prior to July 18, 1955. On March 7, 1955, the United States District Court for the Southern District of New York granted similar motions by a shareholder of debtor and by the Securities and Exchange Commission to dismiss debtor's petition unless it was amended so as to comply with the requirements of Chapter X of the Bankruptcy Act. In re General Stores Corporation, D.C.S.D.N.Y.1955, 129 F.Supp. 801. One month later we affirmed that decision, General Stores Corporation v. Shlensky, 2 Cir., 1955, 222 F.2d 234. On August 17, 1955, Lewis J. Ruskin as trustee under the collateral agreement, Lewis J. Ruskin individually, and Rexall Drug Company notified the debtor that they elected to declare the notes "forthwith due and payable because of an event of default occurring and existing under said collateral agreement by reason of the proceedings involving General Stores Corporation under Chapter XI of the Bankruptcy Act * * * commenced by General Stores Corporation and pending to this date in the United States District Court for

the Southern District of New York." The Supreme Court of the United States affirmed our decision in General Stores Corporation v. Shlensky on March 26, 1956, 350 U.S. 462, 76 S.Ct. 516, 100 L. Ed. 726, and about one month later the debtor filed an amended petition asking for reorganization under Chapter X of the Bankruptcy Act. The district court approved the amended petition on May 1, 1956 and appointed a reorganization trustee.

This appeal stems from a petition filed by Ruskin, as trustee under the collateral agreement, seeking a determination of the amount of his claim on the unpaid notes, principal and interest, and of the amount of his lien for his own and his attorneys' compensation. Ruskin claimed unpaid accrued interest at 4% to August 17, 1955, the date of the acceleration, and 6% thereafter. As compensation for his services as trustee Ruskin sought, at the rate of $35,000 per annum, $112,715.-13 for the period October 18, 1954 to January 7, 1958. He also sought $180,-000 as compensation for his attorneys. The court below decided that the post-default interest rate should remain at 4% rather than be increased to 6%; awarded Ruskin $24,215 as total compensation for his own services as collateral trustee, and granted attorneys' fees in the amount of $60,000. In re General Stores Corporation, D.C.S.D.N.Y.1958, 164 F.Supp. 130. The parties seem to agree that the debtor is solvent.

From these several determinations Ruskin appeals. The reorganization trustee, a stockholder of the debtor, and the Securities and Exchange Commission are all in opposition.

### The Claim for Increased Interest

■ Although the contract between the parties explicitly provided that interest was to be at 6% rather than 4% after acceleration, the district court refused to allow the additional 2% interest. Relying upon Vanston Bondholders Protective Committee v. Green, 1946, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162, rehearing denied 1947, 329 U.S. 833, 67 S.Ct. 497, 498, 91 L.Ed. 706, it held that Ruskin was not entitled to the benefit of his variable interest contract. We disagree with that holding.

In Vanston the Supreme Court disallowed an indenture trustee's claim against an insolvent debtor for interest on interest payments provided for in the trust indenture. The interest on interest accrued because the district court, pursuant to its administration of an equity receivership, had ordered both the debtor and the receiver not to pay simple interest coupons that fell due under the indenture after the court assumed jurisdiction. Even if we agreed with the court below that a Supreme Court precedent dealing with an obligation for interest on interest falling due because of an equity court's stay order is equally applicable to a claim based upon a contractual provision for additional simple interest arising because the debtor sought the intervention of the bankruptcy laws, a question we need not now decide, we would still have to distinguish Vanston on what we find was a basic ground of that decision. In Vanston the debtor was insolvent, and in our case it appears the debtor is solvent. In Empire Trust Co. v. Equitable Office Bldg. Corp., 2 Cir., 1948, 167 F.2d 346, we avoided a resolution of the effect of Vanston upon parties to a reorganization proceeding involving a solvent corporation, but the issue is squarely before us now, and we hold that the Supreme Court did not intend that the principle enunciated by it in Vanston, in a contest between creditors, should be applied to a contest between a debtor's creditor and its stockholders.

The Supreme Court held in Vanston that since the district court had taken over the debtor's assets for the purpose of preserving and protecting them "pending a ratable distribution among all the creditors according to their interests as of the date the receivership began," [329 U.S. 156, 67 S.Ct. 242] it would have been contrary to that purpose and inequitable to the junior creditors to have junior creditors suffer and the mort-

gage bondholders enriched because of a stay order required to further the receivership aim. This result naturally followed from an examination of the usual rules that deal with simple interest claims in bankruptcy and in reorganization proceedings, In re Wisconsin Cent. Ry. Co., D.C.D.Minn.1950, 93 F.Supp. 579, 582, affirmed United States Trust Co. of New York v. Zelle, 8 Cir., 1951, 191 F.2d 822, certiorari denied 1952, 342 U.S. 944, 72 S.Ct. 558, 96 L.Ed. 703. Thus, with respect to simple interest the Supreme Court said:

> "The general rule in bankruptcy and in equity receivership has been that interest on the debtors' obligations ceases to accrue at the beginning of proceedings. Exaction of interest, where the power of a debtor to pay even his contractual obligations is suspended by law, has been prohibited because it was considered in the nature of a penalty imposed because of delay in prompt payment —a delay necessitated by law if the courts are properly to preserve and protect the estate for the benefit of all interests involved * * * Courts have felt that it would be inequitable for anyone to gain an advantage or suffer a loss because of such delay." 329 U.S. at pages 163, 164, 67 S.Ct. at page 240.

However, the Court carefully noted that this rule with respect to simple interest did not apply where the contest was between a creditor and stockholder of the debtor:

> "But where an estate was ample to pay all creditors and to pay interest even after the petition was filed, equitable considerations were invoked to permit payment of this additional interest to the secured creditor rather than to the debtor." 329 U.S. at page 164, 67 S.Ct. at page 241.

Since the result the Court reached stemmed from the equitable principles developed with respect to creditors' claims for simple interest in bankruptcy and equity receivership proceedings, and since it explicitly noted that these principles favored the debtor's creditors over its stockholders, the Court could hardly have meant that the rule it was declaring was to be applied in the case of a solvent debtor.

The district court decided that a result opposite to the one we reach here is dictated by that language in the Vanston opinion which states:

> "It is manifest that the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or between creditors and the debtor." 329 U.S. at page 165, 67 S.Ct. at page 241.

It seems to us, however, that when this language is read in context it does not support the decision of the district court. It follows after a discussion of two differing situations,

> "To allow a secured creditor interest where his security was worth less than the value of his debt was thought to be inequitable to unsecured creditors * * * But where an estate was ample to pay all creditors and to pay interest even after the petition was filed, equitable considerations were invoked to permit payment of this additional interest to the secured creditor rather than to the debtor" 329 U.S. at page 164, 67 S.Ct. at page 240.

and refers only to that discussion. See In re Realty Associates Securities Corporation, 2 Cir., 1947, 163 F.2d 387, 392 (dissenting opinion of Clark, J.), certiorari denied 1947, 332 U.S. 836, 68 S.Ct. 218, 219, 92 L.Ed. 409.

Of the many cases cited to us only two seem worthy of attention. In re Schafer's Bakeries, D.C.E.D.Mich.1957, 155 F.Supp. 902, relied upon by the district court, might be persuasive authority for the decision below if it were clear that that case involved a solvent debtor. However, there is nothing in the opinion to indicate that it did, and, since the plaintiff's claim for interest

on interest was successfully contested by an "Unsecured Creditors' Committee," it would seem that the debtor was actually an insolvent one. Certainly the court never pointed out whether the debtor there was solvent or insolvent, or discussed this distinction. On the other hand, in In re International Hydro-Electric System, D.C.D.Mass.1951, 101 F. Supp. 222, 224, the Massachusetts district court carefully considered this very problem when it held:

"[I]t is important that IHES is not at the present time insolvent. It has assets more than sufficient to meet all claims of its creditors. No benefit will be given to the debenture holders at the expense of any other class of creditors. The burden of this payment will fall entirely on the interest of the stockholders. They cannot complain that they are treated inequitably when their interest is cut down by the payment of a sum to which the debenture holders are clearly entitled by the express provisions of the trust indenture. The situation here differs from that in Vanston Bondholders Protective Committee v. Green * * * where the payment of interest on deferred interest payments was not allowed even though called for by the trust indenture, because the payment would have reduced the share of subordinate creditors in the reorganization of an insolvent corporation."

■ A variable interest provision in event of a stated default such as we have here is not a penalty, nor should it be considered unconscionable. Compare Union Estates Co. v. Adlon Const. Co., 1917, 221 N.Y. 183, 116 N.E. 984, 12 A.L.R. 363, with Newburger-Morris Co. v. Talcott, 1916, 219 N.Y. 505, 510, 114 N.E. 846, 3 A.L.R. 287. It can be beneficial to a debtor in that it may enable him to obtain money at a lower rate of interest than he could otherwise obtain it, for if a creditor had to anticipate a possible loss in the value of the loan due to his debtor's bankruptcy or reorganiza-

tion, he would need to exact a higher uniform interest rate for the full life of the loan. The debtor has the benefit of the lower rate until the crucial event occurs; he need not pay a higher rate throughout the life of the loan.

Undoubtedly the debtor filed its petition under Chapter XI because it believed it beneficial to itself to do so, and in a case such as this, where there is no showing that the creditor entitled to the increased interest caused any unjust delay in the proceedings, it seems to us the opposite of equity to allow the debtor to escape the expressly-bargained-for result of its act.

### Ruskin's Claim for Compensation Under the Collateral Agreement

■ Article VIII, Section 1(2) of the collateral agreement provided as follows:

"Section 1. The Trustee accepts the Trust of this Collateral Agreement upon the following terms and conditions to which General and the holder and holders of the Notes secured hereby agree:

\* \* \* \* \* \*

"(2) The Trustee shall be entitled to reasonable compensation for all services rendered in the execution of the trusts hereby created, to be paid, for services prior to the existence of one or more of the events of default mentioned in Section 1 of Article VI hereof by the holders of the Notes ratably, and for services after the existence of one or more of the events of default mentioned in Section 1 of Article VI hereof, by General; and for such payment, the Trustee shall have a lien on the Trust Estate and all funds in the hands of the Trustee, in priority to the rights and claims of the holder or holders of said Notes."

Pursuant to this section Ruskin claims $112,715.13 from debtor for his services from October 18, 1954 computed to January 7, 1958, at $35,000 per annum. These services allegedly consisted of directing the policy of closing small volume or marginal stores and opening large

volume self-service stores; directing the acquisition of the Wright and Lawrence chain of drug stores; directing the development of "system stores" and the placing of higher profit margin items in the rack jobbing operations in the grocery chains when the profits of the so-called "Huron division" servicing these grocery chains began to diminish because of direct drug purchases by these chains; directing the weekly meetings of "operating committees" wherein Ruskin counseled and guided the company executives; making personal visits to the offices of the subsidiaries in Chicago ten or eleven times a year for four days at a time; while at home in Arizona, keeping in constant contact with the executives and studying reports sent to him; and generally keeping in touch with industry trends and directing the companies' policies. Looking at the question of compensation in terms of what it found were the requirements of Article VIII, Section 1(2) of the collateral agreement—i. e., that the services be rendered in the "execution of the trusts" and the compensation be "reasonable"—the district court allowed Ruskin a total of $24,215. In an order entered July 1, 1958, upon what was in effect a petition for a rehearing, the district court reaffirmed this allowance.

The fixing of allowances is not only the most thankless task in all of the problems of judicial reorganization, it is also the most delicate. Scribner & Miller v. Conway, 2 Cir., 1956, 238 F.2d 905; Finn v. Childs Co., 2 Cir., 1950, 181 F.2d 431. Consequently an appellate court would be less than wise if it did not rely heavily for guidance in such matters upon the SEC which functions as a responsible and disinterested public agency, Scribner & Miller v. Conway, supra; Finn v. Childs Co., supra, and the district court whose intimate knowledge of the whole reorganization gives it a peculiar advantage, Johnson v. Carolina Scenic Stages, 4 Cir., 1957, 242 F.2d 263; Finn v. Childs Co., supra; Milbank, Tweed & Hope v. McCue, 4 Cir., 1940, 111 F.2d 100. And see Surface Transit Inc. v.

Saxe, Bacon & O'Shea, 2 Cir., 266 F.2d 862. In this case the rate of compensation recommended by the SEC would have entitled Ruskin to a sum somewhat less than $20,000. Since this is approximately $5,000 less than the district court awarded him it would require a strong showing by Ruskin in order for us to award him an additional sum, or to remand this case to the district court for reconsideration. While the district court pointed out that [164 F.Supp. 142] "the services of the collateral trustee to some extent contributed to the stabilization in management of the two subsidiaries concerned," and that "in part the success of these corporations during the period in question came from attention which the collateral trustee's control effected," it found that there was no convincing evidence to show that all or even a large portion of Ruskin's activities were necessary to properly execute the purpose of his trust—i. e., the purpose of seeing that the note holders were properly secured. Also the court found that there was no substantial evidence to indicate that an executive capable of conducting the necessary supervision of the two subsidiaries was not in their employ, or could not have been hired by them, and therefore services rendered by Ruskin for which he sought compensation as a trustee were unnecessary. After an examination of the record we are not convinced that the district court's findings and award are clearly erroneous.

### Claim for Compensation for Attorneys' Fees

■ Ruskin's last contention on this appeal is that the district court did not allow him sufficient compensation for attorneys' fees. His claim for $180,000 for the period between October 15, 1954 and December 13, 1957 was predicated under Section 1(3) of Article VIII of the collateral agreement. That section provides:

"The Trustee may employ agents, attorneys and counsel in the execution of said trusts, who may also be the attorneys and counsel of the

holder or holders of said Notes, and of Ford and Stineway, or their successors, or any one or more of them, and the reasonable compensation of the Trustee's attorneys and counsel and of any other person as the Trustee may employ in the administration and management of the trusts hereunder, and all other reasonable expenses necessarily incurred or actually disbursed hereunder, General agrees to pay to the Trustee on demand; and for such payment, the Trustee shall have a lien on the Trust Estate, and on all funds in the hands of the Trustee, in priority to the rights and claims of the holder or holders of said Notes."

$80,000 of the claim was for the Chicago law firm of Ruskin & Rosenbaum and $100,000 was for the New York firm of Paul, Weiss, Rifkind, Wharton & Garrison. After careful consideration of the items of Ruskin's claim and upon the advice of the SEC, the district court allowed Ruskin & Rosenbaum the sum of $5,000 for the period between October 15, 1954 and April 30, 1956, and made a joint award of $55,000 for the combined services of Ruskin & Rosenbaum and Paul, Weiss, Rifkind, Wharton & Garrison for the period from on or about April 30, 1956 to December 15, 1957.

Ruskin contends that the district court committed error in making these awards because it applied a wrong standard in evaluating counsel's services. He argues that the court rewarded these two firms only for services that brought forth actual benefits accruing to the debtor's estate rather than for the services which, pursuant to contract, they rendered to him as collateral trustee. We find nothing in the district court's opinion which would indicate that it applied the standard which Ruskin contends it did apply. Rather, all the indications we find are to the contrary. Thus:

"There is inadequate proof to indicate that the extensive time involved in preparing lengthy briefs was necessary for the protection of the collateral trustee and his trust * * *" 164 F.Supp. at page 145.

"Here, we are concerned with a trust in which the fundamental premise on which the allowance is made must be based upon what is fair and reasonable under the circumstances of the particular case. The necessity of the services depends in the first instance upon whether or not the proceedings initiated were reasonably essential to the protection of the trust. The amount allowed should bear a reasonable relationship to the demands of the situation." 164 F.Supp. at page 146.

The district court fully realized that it was making an award under a contract between the debtor and Ruskin. It was also aware, and rightly so, that the award would be paid from a reorganization debtor's assets. Newman & Bisco v. Realty Associates Securities Corp., 2 Cir., 1949, 173 F.2d 609; Butzel v. Webster Apartments Co., 6 Cir., 1940, 112 F.2d 362. Consequently, in order to avoid that "vicarious generosity" which the courts have so often deplored, Finn v. Childs Co., 2 Cir., 1950, 181 F.2d 431, it considered in detail the services rendered by the two firms. In making the allowances it found and properly took into account that there was some duplication of services rendered by the New York and Chicago firms, Finn v. Childs Co., supra; Newman & Bisco v. Realty Associates Securities Corp., supra; that certain of the services rendered related to matters that did not need legal action or require advice of counsel; that the issues dealt with by counsel were not complex, Newman & Bisco v. Realty Associates Securities Corp., supra; In re McGrath Mfg. Co., D.C.D.Neb.1951, 95 F.Supp. 825; that approximately half of the recorded time spent by the New York firm was contributed by a junior associate, Finn v. Childs Co., supra; that during the period for which compensation was being sought for them by the collateral trustee, the Chicago firm was receiving an annual retainer of $15,000 from Ford Hopkins.

Ruskin does not demonstrate that these findings of the district court were clearly

erroneous. Nor does he show that the court's award made on the basis of those findings, an award in accord with the recommendation of the SEC, was an improper one. With respect to SEC recommendations in such matters, we said in Finn v. Childs Co., supra, 181 F.2d at page 438:

"[T]he figures presented by the S.E.C. are not 'mere casual conjectures,' but are 'recommendations based on closer study than a district judge could ordinarily give to such matters.' Frank, supra, 18 N.Y.U.L. Q.Rev. 317, 1941. We agree with District Judge Kirkpatrick's apt statement 'that the Commission is about the only wholly disinterested party in the proceeding and that, while it may not be entirely familiar with "the problems of making both ends meet in a law office" referred to by counsel, its experience has made it thoroughly familiar with the general attitude of the Courts and the amounts of allowances made in scores of comparable proceedings.' In re Philadelphia & Reading Coal & Iron Co., D.C.E.D.Pa., 61 F.Supp. 120, 124."

We cannot say that here the broad discretion with which the district judge, in the first instance, must of necessity be empowered in this type of case, see Johnson v. Carolina Scenic Stages, 4 Cir., 1957, 242 F.2d 263, has been abused.

Accordingly, we affirm that portion of the district court's order disposing of the claims of the collateral trustee for compensation for himself and for allowance with which to compensate his attorneys; we reverse the portion of that order that denies interest on the unpaid installment notes at a rate in excess of 4% per annum from August 17, 1955 forward; and the cause is remanded for further proceedings not inconsistent with this opinion.

WASHINGTON, Circuit Judge (concurring in part and dissenting in part).

I would affirm the District Court's judgment in its entirety. As to the variable interest claim, I think the District Court correctly viewed the matter as one for the application of equitable principles, whether the corporation was solvent or insolvent. It carefully weighed the equities, see 164 F.Supp. 130, at pages 136–140, and concluded that the extra interest should not be allowed. I do not think it abused its discretion, and would not disturb its holding.