**In the Matter of Proceedings for an Arrangement under Chapter XI of the Bankruptcy Act of GENERAL STORES CORPORATION, Debtor.**

United States District Court,
S. D. New York.
Jan. 24, 1955.

Otterbourg, Steindler, Houston & Rosen, New York City, for debtor, Aaron Rosen, Frederic P. Houston, Marks F. Paskes, New York City, of counsel.

Reich, Peller, Guadagno & Caine, New York City, for Max Shlensky, petitioner, A. Alan Reich, New York City, of counsel.

Blumberg, Singer, Heppen & Blumenthal, New York City, for Creditors' Committee.

George Zolotar, New York City, for Securities and Exchange Commission.

DIMOCK, District Judge.

On October 18, 1954, General Stores Corporation, the Debtor, filed a petition in this court under section 322 of the Bankruptcy Act, 11 U.S.C. § 722, proposing an arrangement under Chapter XI of the Act. A stockholder, Max Shlensky, has moved by order to show cause under section 328 of the Act, 11 U.S.C. § 728, for a dismissal of the proceedings unless the petition be amended so as to comply with Chapter X. The Securities and Exchange Commission has moved for leave to intervene and to support a motion which it has filed for the same relief as asked by the stockholder.

The motion of the Securities and Exchange Commission for leave to intervene is granted. Its motion for dismissal of the proceedings unless the petition be amended so as to comply with Chapter X will be considered with that of the stockholder.

The factors which should control the decision of the question have been discussed by the Supreme Court in Securities and Exchange Commission v. U. S. Realty & Improvement Co., 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293. There the court stated, 310 U.S. at page 447, 60 S. Ct. at page 1049, that "the two chapters were specifically devised to afford different procedures, the one adapted to the reorganization of corporations with complicated debt structures and many stockholders, the other to composition of debts of small individual business and corporations with few stockholders". In that case proceedings under Chapter XI were dismissed. The debtor there had outstanding 900,000 shares of stock listed on the New York Stock Exchange and held by 7,000 stockholders. Its assets were listed at about $7,000,000 and its liabilities at about $5,000,000.

In a more recent case the Court of Appeals for this Circuit has declined to interfere with a refusal by the district court to order that proceedings under Chapter XI be redirected under Chapter X. Matter of Transvision, Inc., 2 Cir., 217 F.2d 243. In the Transvision case the debtor had outstanding 385,000 shares of common stock and 1773½ shares of preferred. All were in the hands of management interests except 135,000 shares of common held by 425 investors. It was not listed on any exchange. The debtor's liabilities were about $700,000 and its assets about $1,000,000.

In the instant case the Debtor has outstanding 2,232,422 shares of common stock listed on the American Stock Exchange and held by 7,000 stockholders. It is in part listed with the Securities and Exchange Commission pursuant to

the Securities Act of 1933 [15 U.S.C.A. § 77a et seq.] The Debtor's liabilities are listed at about $4,000,000 and its assets at about $5,000,000.

The proposed arrangement would have compulsory effect only on the unsecured creditors who are entitled to no priority. They would receive 100% of their claims, 20% on confirmation of the plan and 20% annually thereafter.

The Debtor, now known as General Stores Corporation, was formerly D. A. Schulte, Inc. The stock was in part issued pursuant to a plan of reorganization pursuant to section 77B of the Bankruptcy Act [11 U.S.C.A. § 207] which was consummated as of October 31, 1940. The balance was later sold by the debtor at prices ranging from $1.375 to $1.60 per share.

The Debtor was organized in 1915 and throughout most of its history operated a chain of stores for the sale of tobacco and accessory products as well as other sundry items. After the 77B reorganization proceeding and during the war years the Debtor enjoyed a profitable operation due principally to wartime scarcities. In the post-war period, however, the Debtor's volume began to fall. In addition, the Debtor's profit margin, already low with respect to most of its products, became narrower as prices declined and costs rose. Attempts at modernization of existing units failed materially to stem continuing losses. A sale of the 400,000 shares of common stock in 1951 was accompanied by a change in the management of the enterprise. It was announced at that time that the $600,000 proceeds of the stock sale would be used to convert a number of the existing units to candy or food and drink operations in order to improve profit margins and thus reduce the company's losses. After consummation of the stock sale, however, further studies of the program were made and, upon discovery that costs of conversion would be too great, the program was abandoned and

the proceeds of the sale were used for general corporate purposes. During the four years and five months ended March 31, 1953 the Debtor sustained aggregate losses exceeding $2,700,000. With the continuance of losses in 1953 and 1954 [1] the Debtor embarked upon a program of discontinuing the operation of its Schulte-type stores.[2]

In August 1953, the Debtor purchased all of the outstanding capital stock of Stineway Drug Company. Stineway operates a chain of 23 retail stores in the Chicago area engaged in selling drugs, cosmetics, tobacco products, drug sundries, candy and liquor; all but one of the stores also operate fountains and luncheonettes. In addition, Stineway operates a public cafeteria and sells merchandise to 12 independent stores in the Chicago area known as Stineway System Stores. The purchase price of this stock was $1,220,320.50, $800,000 of which was paid by the Debtor at the closing and the balance was to be paid on April 15, 1954. Of the $800,000 down payment, $365,000 was ultimately borrowed by the Debtor from Stineway; according to the company's latest prospectus, the Debtor borrowed an aggregate of $870,000 from Stineway to pay part of the purchase price.

Early in 1954 the Debtor contracted to purchase all the capital stock of Ford Hopkins Company. Ford Hopkins is engaged in the operation of a chain of 48 drug stores and three restaurants principally in Chicago as well as elsewhere in Illinois and in Indiana, Iowa and Wisconsin. Ford Hopkins also owns all the stock of Sargent's Drug Store, the operator of five stores in the Chicago area, and supplies approximately 700 grocery chain stores with standard cosmetic items.

The purchase price of the Ford Hopkins stock was $2,800,000, payable $735,000 upon consummation and the balance over a period of years, at 4% interest. The down payment of $735,000 was de-

---

1. For the five years and five months ended March 31, 1954 the Debtor sustained losses exceeding $4,200,000.

2. At July 21, 1954, 146 such stores were in operation.

rived from (1) the proceeds of the sale of 178,500 shares of common stock in May 1954: $245,438; (2) the proceeds of loans, including one from the Debtor's president: $55,000; and (3) the proceeds of a loan from Stineway: $440,-000.[3]

To secure the balance of the purchase price, $2,065,000, the Debtor transferred the following collateral to a Trustee: (1) all of the capital stock of Ford Hopkins and Stineway; (2) dividends payable upon Ford Hopkins and Stineway stock; (3) life insurance policies aggregating $1,700,000 upon the life of the Trustee (one of the sellers); (4) the Debtor's rights to commissions payable to it by Ford Hopkins and Stineway under service contracts based generally upon 1% of the respective net sales of Ford Hopkins and Stineway.

After the consummation of the Ford Hopkins purchase, the indebtedness of the Debtor to Stineway was represented by two non-interest bearing notes, in the amount of $225,000 payable December 15, 1954 and in the amount of $1,085,000 payable June 1, 1964.

In a Chapter X proceeding the Securities and Exchange Commission would have, among others, the following rights, powers, privileges and duties:

A. Section 172, 11 U.S.C. § 572, provides that any plan of reorganization which the judge regards as worthy of consideration must be submitted to the Commission for an advisory report where the scheduled indebtedness of the debtor exceeds $3,000,000.

B. Section 175, 11 U.S.C. § 575, requires that the report of the Commission, if any, filed in the proceedings, or a summary of the report prepared by the Commission, be transmitted to all creditors and stockholders affected by the plan.

C. Section 208, 11 U.S.C. § 608, provides that the Commission must, if requested by the judge, and may, upon its own motion if approved by the judge, file a notice of its appearance in any Chapter X proceeding. It further provides that upon the filing of such notice of appearance, the Commission shall be deemed to be a party in interest, with the right to be heard on all matters arising in the proceeding, and shall be deemed to have intervened in respect of all matters in the proceeding with the same force and effect as if a petition for that purpose had been allowed by the judge, with the exception that the Commission may not appeal or file any petition for appeal in the proceeding.

D. Section 265, 11 U.S.C. § 665, provides that the Commission shall be given notice of all steps taken in connection with any proceeding, and that there shall be transmitted to the Commission copies of prescribed papers filed in the proceeding and of such other papers as the Commission may request or the Court may direct be transmitted to it.

The Securities and Exchange Commission says that thus Chapter X, unlike Chapter XI, provides adequate means for a disinterested analysis of the Debtor's financial condition and the desirability of the continuance of the enterprise as presently constituted or on any other basis, in order to provide the Court, the parties and the creditors and stockholders with a basis for the exercise of an informed judgment as to the fairness and feasibility of reorganization proposals.

I do not think that the stockholders and creditors ought to be left to do this for themselves as they would have to in a Chapter XI proceeding. One of the strongest reasons for creating a body with the powers of the Securities and Exchange Commission was the propensity of those who had a stake in an enterprise to follow blindly the proposals of management.

In the case of Transvision, Inc., D.C., 119 F.Supp. 134, with its 475 outside investors, Judge Sugarman exercised his

---

3. Stineway derived this cash from the sale of warehouse inventory to Ford Hopkins. Ford Hopkins in turn was required to borrow $400,000 from a bank in order to pay for the inventory.

discretion in favor of proceeding under Chapter XI and the Court of Appeals upheld him. I do not feel, however, that the action of the Court of Appeals constrains me to leave this enterprise to treatment adapted in the words of the Supreme Court in the U. S. Realty case [310 U.S. 434, 60 S.Ct. 1049], "to composition of debts of small individual business and corporations with few stockholders". It would require a much more complete demonstration than is possible at the threshold of a proceeding to convince me that supervision was unnecessary over the reorganization of a corporation with 7,000 holders of two and a quarter million shares of stock listed on the American Stock Exchange and recently selling at under two dollars a share.

The motion to dismiss unless the Debtor proceeds under Chapter X is granted.

Settle order on notice.