### Matter of GENERAL STORES CORPORATION, Debtor.

United States District Court
S. D. New York.
June 2, 1958.

See, also, D.C., 150 F.Supp. 868.

Frederick P. Close, White Plains, N. Y., Martin Drazen, New York City, of counsel, for Reorganization Trustee, Charles H. Griffiths.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Simon H. Rifkind, New York City, Harry H. Ruskin, Chicago, Ill., John E. Massengale, Stephen Wise Tulin, Pauli Murray, New York City, of counsel, for Secured Creditors and Collateral Trustee.

Louis J. Weinshenker, New York City, Edward A. Gorenstein and Walter Good-

man, Chicago, Ill., Associate Counsel, for Creditor, Richard Goodman.

Richard Goodman, Chicago, Ill., pro se.

Netter & Netter, New York City, Edward Rothenberg, of counsel, for Florence Brill, Stockholder.

Townsend & Lewis, New York City, John F. Davidson, of counsel, for Stockholders' Protective Committee.

Richard V. Bandler, Kiva Berke, of counsel, for Securities and Exchange Commission.

White & Case, New York City, Haliburton Fales, 2nd, of counsel, for The Prudential Ins. Co. of America.

LEVET, District Judge.

On May 19, 1954, General Stores Corporation (hereinafter also called the debtor) in Chicago, Illinois, made and delivered its two promissory notes (attached to Secured Creditors' Exhibit F) to the secured creditors, Lewis J. Ruskin and Rexall Drug Company. The notes (originally totalling $2,065,000) provided for interest on principal at the rate of 4% per annum, and further provided that in case of an event of default as defined in the collateral agreement (Secured Creditors' Exhibit F) the total unpaid principal may be declared due and payable, in which event 6% interest was to accrue.

A collateral agreement by and between General Stores Corporation, said debtor, and Lewis J. Ruskin as trustee for the payees of the notes, which agreement was simultaneously entered into with the execution of the notes, provides, among other things, as follows:

"If any one of the following events of default (hereby defined and entitled 'event of default' or 'events of default') shall occur: * * * or if any proceedings before Control Date involving General or any subsidiary (other than Ford or Stineway) thereof or any successors thereto, and after Control Date involving General, Ford or Stineway or any subsidiary thereof or successors thereto, are commenced by or against such company under any bankruptcy, reorganization, arrangement, insolvency or readjustment of debt, dissolution or liquidation law or statute of the Federal Government or any state government * * * ; then, in any such event, the holder or holders of any of the Notes then outstanding or the Trustee may, at their or his option, declare such Notes, to be, and thereupon such Notes shall become, forthwith, due and payable * * *." Article VI, Section 1.

The notes covered the balance of the purchase price for all outstanding shares of stock of the Ford Hopkins Company. The debtor transferred to the collateral trustee, Lewis J. Ruskin, collateral, including all the outstanding stock of the Ford Hopkins Company and of the Stineway Drug Company, with all voting rights thereof. This collateral was pledged to secure, among other sums, payment of the principal and interest on the aforesaid notes.

On October 18, 1954, the debtor, General Stores Corporation, filed a petition for arrangement under Chapter XI of the Bankruptcy Act, 11 U.S.C.A. § 701 et seq.

After certain preliminary negotiations, none of which were formally reduced to writing, Lewis J. Ruskin as trustee under the said collateral agreement entered into a so-called "standby agreement," dated November 1, 1954, which is here set forth in full:

"November 1
1954
"General Stores Corporation
"New York City, N. Y.
"Gentlemen:

"For the purpose of allowing you an opportunity to effect an arrangement with your unsecured creditors in the proceedings instituted by you for an Arrangement under Chapter XI of the Bankruptcy Act, the undersigned Trustee under the Collateral Agreement dated May 19, 1954 agrees that provided and so long as no one or more of the following events (herein called 'events') oc-

curs, to-wit: any action taken by you or anyone else to affect any of the rights of the Trustee or the Noteholders under the Collateral Agreement or the notes secured thereby, or you are adjudicated a bankrupt, or the pending Chapter XI proceedings is changed to Chapter X proceedings, or the principal payments on the notes secured by the Collateral Agreement payable November 1, 1954 and December 1, 1954, respectively, are not paid when due, the undersigned Trustee will not prior to July 18, 1955 foreclose the Trust Property held under the Collateral Agreement because of the institution by you of said proceedings for an Arrangement under Chapter XI of the Bankruptcy Act or your failure to pay in whole or in part interest payable on the notes secured by the Collateral Agreement on December 1, 1954 and January 1, 1955. Upon the occurrence prior to July 18, 1955 of any other event of default mentioned in Section 1 of Article VI of the Collateral Agreement or of any event herein mentioned this assurance not to foreclose shall thereupon terminate and be of no effect whatsoever.

"It is understood and agreed, and this assurance is accepted by you with the understanding that nothing herein contained shall affect or be deemed to affect any other rights or privileges of the Trustee or any rights whatsoever of the Noteholders or your obligations under the notes and Collateral Agreement.

"Very truly yours,
"[Signed] Lewis J. Ruskin

"as Trustee under the Collateral Agreement by and between General Stores Corporation and Lewis J. Ruskin, dated May 19, 1954."

Secured Creditors' Exhibit I.

On March 7, 1955, certain motions of Max Shlensky, a stockholder of General Stores, and the Securities and Exchange Commission were granted by Judge Dimock. D.C., 129 F.Supp. 801. The order, after denial of motion for reargument, provided:

"1. The motion by the Securities and Exchange Commission for leave to intervene in this proceeding for the purpose of moving to dismiss the debtor's petition herein, to deny confirmation of the proposed Chapter XI proceeding and to dismiss the arrangement herein, be and the same hereby is granted;

"2. The petition of General Stores Corporation for relief under Chapter XI of the Bankruptcy Act and the proceedings under Chapter XI, be and they hereby are dismissed unless on or before March 15, 1955, General Stores Corporation file an amended petition to comply with the requirements of Chapter X for the filing of a debtor's petition or unless on or before such date a creditors' petition under Chapter X be filed."

On or about April 14, 1955, the Court of Appeals of the Second Circuit affirmed the said order of the District Court in an opinion reported at General Stores Corp. v. Shlensky, 222 F.2d 234.

Thereafter, certiorari was granted by the Supreme Court of the United States, 350 U.S. 809, 76 S.Ct. 65, 100 L.Ed. 550, and on or about March 26, 1956, the said order of the District Court and the said affirmance of the Court of Appeals of the Second Circuit was duly affirmed in an opinion reported at 350 U.S. 462, 76 S.Ct. 516, 100 L.Ed. 726.

On June 28, 1955, the "standby agreement" of November 1, 1954, was, at the request of the debtor, extended for thirty days to and including August 16, 1955. The provisions of the letter granting this extension are as follows:

"The expiration date specified in my assurance not to foreclose is July 17, 1955.

"Per your request, I hereby extend this expiration date 30 days to and including August 16, 1955.

"It is understood that this letter is accepted by you with the understanding that nothing herein contained shall affect or be deemed to affect any other rights or privileges

of the Trustee under the Collateral Agreement or any rights whatsoever of the Noteholders or your obligations under the notes and Collateral Agreement." Secured Creditors' Exhibit L.

On August 17, 1955, Lewis J. Ruskin as trustee under the aforesaid collateral agreement and Lewis J. Ruskin individually and Rexall Drug Company, the payees of the notes, notified the debtor that they elected to declare the aforesaid notes to be "forthwith due and payable because of an event of default occurring and existing under said collateral agreement by reason of the proceedings involving General Stores Corporation under Chapter XI of the Bankruptcy Act, as amended, of the United States, commenced by General Stores Corporation and pending to this date in the United States District Court for the Southern District of New York." [150 F.Supp. 868]. Secured Creditors' Exhibit J.

On October 28, 1955, Lewis J. Ruskin as said trustee under said collateral agreement further notified the debtor in writing, in part, as follows:

"You are further advised that the principal amount of the notes secured by the Collateral Agreement dated May 19, 1954, namely, $1,594,248.63 on the note payable to the order of Lewis J. Ruskin and $455,751.37 on the note payable to the order of Rexall Drug Company, are past due and payable. They bear interest in accordance with their provisions at the rate of 6% per annum from and after August 17, 1955, when the notes were declared due and payable, and as of September 30, 1955, the interest payable on the note payable to the order of Lewis J. Ruskin aggregated $73,464.54, and the interest payable on the note payable to the order of Rexall Drug Company aggregated $21,002.29. Demand is hereby made and renewed for the immediate payment to the undersigned Trustee for the benefit of the holders of said notes of the whole amounts owing on such notes for principal and interest." Secured Creditors' Exhibit N.

On or about April 30, 1956, the debtor filed an amended petition in this court asking for reorganization under Chapter X, 11 U.S.C.A. § 501 et seq., and on May 1, 1956, the United States District Court for the Southern District of New York approved the amended petition and appointed Charles H. Griffiths trustee in the reorganization proceeding.

From the facts above set forth, it appears that the right of the secured creditors to foreclose is predicated upon (1) an alleged default by reason of the commencement by the said debtor of arrangement proceedings under Chapter XI of the Bankruptcy Act, filed as above stated on October 18, 1954 (no other default was claimed); and (2) a notice of acceleration given by the said secured creditors on August 17, 1955, based upon the commencement of the said proceedings under Chapter XI of the Bankruptcy Act.

■ The reorganization trustee and Richard Goodman, a stockholder and creditor, contend that the secured creditors are estopped to rely upon the commencement of the Chapter XI proceeding as an event of default by reason of certain acts of Lewis J. Ruskin and of Harry M. Ruskin, his attorney. While there is proof that the secured creditors acquiesced in, and may to some extent have been instrumental in, bringing about General Stores' original resort to this court, I have concluded that the proof in this regard is insufficient to establish estoppel against default or acceleration.

The evident intent of the collateral trustee, Lewis J. Ruskin, in signing the so-called "standby agreement" of November 1, 1954 (Exhibit I) was to agree not to foreclose the trust property held under the collateral agreement prior to July 18, 1955. There is no indication that by this agreement the collateral trustee waived the default involved in filing the petition under Chapter XI of the Bankruptcy Act. The extension of this "standby agreement" on June 28, 1955

(Exhibit L) to August 16, 1955, was of like character.

■ The "standby agreement" and the extension thereof constituted, in my opinion, only an agreement by the collateral trustee to defer foreclosure. The fact that the collateral trustee gave no notice of foreclosure until April 13, 1956, does not constitute ground for concluding that default was waived. It may be that one of the reasons why the creditor delayed foreclosure related to the tax situation of General Stores Corporation. There was no requirement that the creditor seek to foreclose before April 1956, or at any other particular time.

The fact that an order had been entered on March 7, 1955, dismissing the petitioner under Chapter XI "unless on or before March 15, 1955 General Stores Corporation file an amended petition to comply with the requirements of Chapter X * * *" is not, in my opinion, sufficient to erase the default created by the filing of the petition under Chapter XI. As above stated, the Court of Appeals upheld Judge Dimock's order and the United States Supreme Court affirmed. Later, the debtor filed an amended petition, this time under Chapter X rather than Chapter XI. The filing of such an amended petition is expressly authorized by Section 328 of the Bankruptcy Act, 11 U.S.C.A. § 728. No interpretation of the collateral agreement can be used to obliterate the effect of the filing of the petition under Chapter XI as an event of default. Consequently, I have concluded that the principal of the notes was validly accelerated and became overdue on August 17, 1955. (The amount of the principal indebtedness then was $2,050,000.) The fact that other defaults may have occurred subsequent to October 18, 1954, is immaterial.

### The Secured Creditors' Claim for Interest

The two promissory notes held by the secured creditors provide for interest on principal at the rate of 4% per annum prior to any default by General Stores and prior to acceleration of the debt by the collateral trustee, but provide for interest at the rate of 6% per annum after default and acceleration.

The secured creditors claim interest at 4% to August 17, 1955, and at the rate of 6% per annum thereafter. On that date, the secured creditors notified General Stores of their election to accelerate the debt by virtue of the commencement of Chapter XI proceedings, an event of default under the collateral agreement. As already stated, I have concluded that the principal of the notes was validly accelerated and became overdue on August 17, 1955.

■ The estate of the debtor is here sufficient in estimated value (although neither sold nor liquidated) to pay all of its debts, including at least 4% interest, the security has been productive of income during reorganization (although no dividends have been declared or paid to the debtor during reorganization), and the value of the security exceeds the amount of the debt. Therefore, even under the interest rules applicable to straight bankruptcy cases, the secured creditors are reasonably entitled to interest at the non-accelerated rate of 4% per annum. See Sexton v. Dreyfus, 1911, 219 U.S. 339, 31 S.Ct. 256, 55 L.Ed. 244; Brown v. Leo, 2 Cir., 1929, 34 F.2d 127; In re Macomb Trailer Coach, Inc., 6 Cir., 1953, 200 F.2d 611; Castaner v. Mora, 1 Cir., 1956, 234 F.2d 710; In re Magnus Harmonica Corp., D.C.D.N.J.1958, 159 F.Supp. 778. The absolute priority rule is applicable to this portion of the secured creditors' interest claim. See Consolidated Rock Products Co. v. Du-Bois, 1941, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982; Eddy v. Prudence Bonds Corporation, 2 Cir., 1947, 165 F.2d 157, certiorari denied Prudence Realization Corp. v. Eddy, 1948, 333 U.S. 845, 68 S.Ct. 664, 92 L.Ed. 1128.

However, there remains for determination the issue as to whether or not the secured creditors are entitled to interest at the accelerated rate of 6% per annum. Determination of this issue depends first upon whether this court has the equitable power to prevent the accrual of addi-

tional interest at the accelerated rate, and, second, upon whether the equities in this proceeding militate for or against the accrual of such additional interest.

■ The rule is now too clear for argument that a bankruptcy court is vested with broad equity powers and in a Chapter X proceeding is just as much a court of equity as its statutory and chancery antecedents. Vanston Bondholders Protective Committee v. Green, 1946, 329 U.S. 156, 165, 67 S.Ct. 237, 91 L.Ed. 162; In re Schafer's Bakeries, D.C.E.D.Mich. 1957, 155 F.Supp. 902, 913; see also Pepper v. Litton, 1939, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281. In Vanston Bondholders Protective Committee v. Green, supra, the court in the exercise of its equitable powers denied the first mortgage bondholders' claim for interest on interest accruing after receivership.

The secured creditors have sought to distinguish the Vanston case from the instant proceeding on a number of grounds. For example, they contend in substance that the decision in the Vanston case is applicable only to interest on interest in the nature of a penalty and not to extra interest which constitutes liquidated damages for increased risk. They further argue that whether a contract provision is one for a penalty or for added compensation is determined by applicable state law.

In the Vanston case, Mr. Justice Black, speaking for the majority of the court, expressly noted that the extra interest covenant there involved might be deemed added compensation for the creditor or "something like a penalty to induce prompt payment of simple interest." 329 U.S. at page 166, 67 S.Ct. at page 242. However, he concluded that in either event equitable principles required a denial of the claim.

■ While the Vanston case involved a claim for interest on interest, the principles there enunciated are, in my opinion, applicable to a claim based upon a contractual provision for additional simple interest. The latter form of contractual provision may, and in the instant proceeding does, provide for a substantially larger return to the creditor than would a provision for interest on interest, and the need for equitable regulation is equally vital.

■ Equally without merit is the secured creditors' contention that the validity of their claim for additional interest is determined by state law. In this regard Mr. Justice Black stated:

"When and under what circumstances federal courts will allow interest on claims against debtors' estates being administered by them has long been decided by federal law. Cf. Board of Comm'rs of Jackson County v. United States, 308 U.S. 343, 60 S.Ct. 285, 84 L.Ed. 313; Royal Indemnity Co. v. United States, 313 U.S. 289, 61 S.Ct. 995, 85 L.Ed. 1361 * * *". Vanston Bondholders Protective Committee v. Green, supra, 329 U.S. at page 163, 67 S.Ct. at page 240.

The secured creditors seek to distinguish the Vanston case on the further ground that the default which there gave rise to the claim for extra interest resulted from the court's suspension of the debtor's obligation to pay an installment of interest when due, whereas in the instant proceeding the default resulted from the debtor's "voluntary" act of filing a Chapter XI petition.

In the Vanston case, the court did not direct the receiver to pay the interest installment when due and thereby precipitated a default because "the debtor could not pay." 329 U.S. at page 159, 67 S.Ct. at page 238. In the instant proceeding, General Stores filed a petition in reorganization for essentially the same reason. To term the default in the Vanston case "involuntary" and the default in the present proceeding "voluntary" is to ignore substance for form. In both cases, the defaults arose out of the financial helplessness of the debtors and in each a need for equitable relief arose. Yet, under the distinction here urged by the secured creditors, this court would be powerless to provide equitable relief

with respect to the accrual of extra interest during reorganization, where, by contractual provision, the very act of resorting to reorganization is made an event of default.

■ Considerations of fairness and justice clearly require that a bankruptcy court have the equitable power to disallow a claim for extra interest accruing during reorganization regardless of whether an event of default occurred before or after the commencement of reorganization proceedings and irrespective of whether or not the default resulted under court order.

In In re Schafer's Bakeries, D.C.E.D. Mich.1957, 155 F.Supp. 902, the corporate debtor obtained $87,500 from a creditor in return for two notes totalling $103,150, payable in 24 monthly installments commencing June 1, 1954. Each note provided for interest at the rate of 1½% per month upon each installment payment from the due date thereof until paid. The debtor paid the first monthly installment due June 1, 1954, but defaulted on the second installment due July 1, 1954. The debtor commenced Chapter X proceedings on July 13, 1954. Though the creditor was ultimately paid the full face value of the notes, it, nevertheless, sought to recover interest at the rate of 1½% per month on all defaulted installments from the due date of each installment until the same was paid. The court permitted a recovery of interest on the July 1, 1954, installment from that date until the filing of the reorganization petition. However, it disallowed the creditor's claim for interest during reorganization since the face amount of the notes already included substantial compensation to the creditor for the use of its money. In so holding the court stated:

"Since the amount of the notes in the sum of $103,150 has been paid in full, it is clear that Woodward has already received simple interest on these loans and has been well recompensed for the use of its money. Any further payment by the trustee

under the prevailing circumstances, except interest on the second installment to July 13, 1954, heretofore allowed, would only constitute a penalty for the late payment of those portions of the overdue installments representing the principal sum loaned. * * *" (at page 914.)

In the Schafer's Bakeries case the court exercised its equitable power to disallow a claim for extra interest during reorganization even though the original event of default occurred prior to the filing of the Chapter X petition. The court not only refused to allow what it termed "interest on overdue interest," but also refused to allow "interest on that part of each overdue installment that constitutes repayment of principal." 155 F.Supp. at page 913.

In the Schafer's Bakeries case the debt apparently was not accelerated and the extra interest was sought only on those installments which actually became overdue. Here, the secured creditors seek additional interest on the entire unpaid balance of their loan. Their claim for extra interest is many times larger, and the need for the exercise of equitable control is, therefore, at least as great, if not proportionately greater, than was true in the Schafer's Bakeries case, supra.

■ The secured creditors argue that the equitable doctrine with respect to extra interest enunciated in the Vanston case, supra, is not appropriate where the contest is between the stockholders and a secured creditor, and the debtor is solvent. The following portion of the Vanston opinion is pertinent in this regard:

"It is manifest that the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or *between creditors and the debtor*. See Sexton v. Dreyfus, supra, 219 U.S. [339] at page 346, 31 S.Ct. [256] at page 258 * * *". (Emphasis supplied.) 329 U.S. 156, 165, 67 S.Ct. 241.

Under the amended plan of reorganization in the instant proceeding, the secured creditors' claim for extra interest, if allowed, would be paid by Richard Goodman, who, in turn, and in consideration therefor, would receive additional shares of stock in the reorganized corporation. The granting of the secured creditors' additional interest claim would thus result in an inflation of capital structure without any commensurate increase in the assets of the reorganized corporation. The condition thereby created and its detrimental effects upon the financial future of the reorganized corporation is of concern not only to the stockholders whose equity in General Stores would be proportionately decreased, but also to those creditors who elect to accept long-term notes of the reorganized corporation. In my opinion, this court, under the circumstances here presented, has the power to disallow the secured creditors' claim for extra interest if the equities so require.

In re International Hydro-Electric System, D.C.D.Mass.1951, 101 F.Supp. 222, does not require a contrary conclusion. There, the court, acting on a recommendation of the Securities and Exchange Commission, allowed a claim by the holders of debenture bonds (in the principal amount of over $26,000,000) for interest on interest which accrued during the course of a rearrangement under the Public Utility Holding Company Act, 15 U.S.C.A. § 79 et seq. The court in substance held that under the circumstances there involved, equity required a payment of the extra interest claim of the debenture bondholders.

Consequently, and in accordance with the foregoing premises, and after a careful consideration of the equities in the present proceeding, I have concluded that the secured creditors' claim insofar as it relates to extra interest at the 6% rate should be disallowed for the following reasons:

(1) The secured creditors by their own conduct in these proceedings may have been at least partially responsible for their protracted length;

(2) The secured creditors were virtually insulated against any increase in risk which might ordinarily have resulted from the commencement of reorganization proceedings:

(a) By the substantial value of the General Stores subsidiaries which were collateral security for the loan; and

(b) By virtue of the collateral trustee's right to exercise certain control over the business of the subsidiaries by the nomination and selection of all of the members of the board of both Ford Hopkins and Stineway in the event of a default. See Article III of the Collateral Agreement, Exhibit F.

(3) As a result of this proceeding, the secured creditors will be paid in full some years before their loan would otherwise have matured in its entirety;

(4) Allowance of the secured creditors' claim for extra interest would to some extent inflate the capital structure of the reorganized corporation to the detriment of its stockholders and of those creditors who elect to accept its long-term notes.

The secured creditors argue that they are equitably entitled to all of the interest sought by them since, at least at the outset of these proceedings, they attempted to cooperate with General Stores in finding a solution to its financial difficulties. The cooperative attitude which the secured creditors exhibited prior to and during the Chapter XI proceeding, in my opinion, constituted nothing more than sound business judgment and enlightened self-interest. To have acted otherwise might have subjected the collateral security to the uncertainties of a forced sale and a possible financial loss to the secured creditors. The initial forbearance practiced by the secured creditors will be rewarded by payment of their loan in full with interest at the non-accelerated rate of 4% per annum. No further reward is, in my opinion, warranted.

It is alleged by the reorganization trustee that there were. funds available in the subsidiary corporations which

under the collateral agreement (Article VII, Section 1) could have been applied toward payment of the indebtedness owed to the secured creditors. As of January 1, 1958, such payments through the subsidiaries could allegedly have amounted to $500,000. While the collateral trustee undoubtedly had the contractual right to apply certain moneys of the subsidiaries toward payment of General Stores' indebtedness to the secured creditors, he was under no legal obligation to do so. To have withdrawn these funds from the subsidiaries might have imperilled their financial position to the detriment of all concerned. Under these circumstances, the secured creditors are, in my opinion, entitled to interest at the non-accelerated rate on the entire amount of unpaid principal owing to them.

Accordingly, the secured creditors are allowed interest on all unpaid balances at the rate of 4% per annum; and so much of their claim as seeks interest at 6% per annum after August 17, 1955, is disallowed.

### The Application of Lewis J. Ruskin for Compensation as Collateral Trustee

Pursuant to the collateral agreement of March 19, 1954, between General Stores Corporation and Lewis J. Ruskin as trustee (Exhibit F), Lewis J. Ruskin has petitioned this court for an allowance for his services as such collateral trustee.

As heretofore explained, this collateral agreement (Exhibit F) assigned and transferred to Lewis J. Ruskin as trustee all the outstanding shares of stock in the Ford Hopkins Company and in the Stineway Drug Company, including the voting rights thereof. This collateral was so pledged to Lewis J. Ruskin as said trustee to secure the payment of principal and interest on two promissory notes of the debtor bearing the date of May 19, 1954, one payable to the petitioner, Lewis J. Ruskin, and one payable to the Rexall Drug Company.

Article VIII, Section 1, subdivision (2) of this collateral agreement (Exhibit F) is as follows:

"Section 1. The Trustee accepts the trust of this Collateral Agreement upon the following terms and conditions to which General and the holder and holders of the Notes secured hereby agree:

\*    \*    \*    \*    \*    \*

"(2) The Trustee shall be entitled to reasonable compensation for all services rendered in the execution of the trusts hereby created, to be paid, for services *prior* to the existence of one or more of the events of default mentioned in Section 1 of Article VI hereof *by* the *holders of the Notes ratably,* and for services *after* the existence of one or more of the events of default mentioned in Section 1 of Article VI hereof, by *General*; and for such payment, the Trustee shall have a lien on the Trust Estate and all funds in the hands of the Trustee, in priority to the rights and claims of the holder or holders of said Notes." (Emphasis supplied.)

On the face of this provision, therefore, the following principles apply:

(1) The services concerned must be those rendered in the "execution of the trusts;"

(2) The compensation must be "reasonable;"

(3) It is only after a default that the trustee is entitled to look to the debtor for payment;

(4) For these services the collateral trustee is to have a lien on the trust estate and all funds in the hands of the trustee in priority to the rights and claims of the holder or holders of the notes.

The principal services allegedly rendered by the collateral trustee were as follows:

(1) The collateral trustee directed the companies in a policy of closing small-volume and marginal stores and opening

new type large-volume self-service stores and ethical drug stores;

(2) He directed the acquisition of another chain of drug stores, known as Wright & Lawrence, Inc.;

(3) When profits of the so-called "Huron division," which division comprised the sale of drugs on racks at super markets, began to diminish by reason of direct drug purchases by such chains, the collateral trustee developed a group of independently owned drug stores called "System stores," to which the subsidiaries made sales;

(4) The collateral trustee revised the type of items placed in the rack jobbing operations in the grocery chains to include items bringing a higher profit margin;

(5) The collateral trustee provided for weekly "operating committee" meetings, at which heads of the respective divisions of operations took action on all operating problems and where the executives were counselled and guided by the collateral trustee.

While certain of these policies may have been advisable and even necessary, none were unusual. They were in accord with, but not in advance of, the business trends of the drug industry current at that time. No convincing evidence of the necessity of the trustee's activities in the execution of these policies for the purpose of the execution of his trust appears. The purchase of the Wright & Lawrence, Inc. chain by the subsidiaries of the debtor, allegedly induced by the trustee, can hardly be considered in the field of the "execution of the trust." Rather, it partook of an owner's expansion.

As to general services rendered by the collateral trustee, he contends that he was personally present at the offices of Ford Hopkins and Stineway about ten or eleven times a year for about four days during each visit. While not in Chicago, he stated that he was in constant touch by telephone (usually from Scottsdale, Arizona) with the executives and department heads; that he studied reports on which he spent no less than ten to twenty-four hours per week; that he kept in touch with industry trends by observing rack jobbing and other operations in various parts of the country; and that he determined and directed the policies for the companies.

He alleges that since October 18, 1954, when General Stores Corporation filed its petition in the Chapter XI proceeding, the task of directing the business of the two subsidiaries became complicated; that he attended certain plan hearings in New York City; that he had negotiations with Richard Goodman in respect to a plan or a settlement; that he performed miscellaneous other services.

Prior to the sale of the stock of Ford Hopkins and Stineway to General Stores Corporation on May 19, 1954, Lewis J. Ruskin was the dominant figure in Ford Hopkins. Continuing with the period starting May 19, 1954, Lewis J. Ruskin was a member of the board of directors of both corporations.

The principal bases on which this collateral trustee claims the rendition of said services became necessary are:

(1) There were no executives available in the companies, or who could be secured, who were capable of coordinating the work of the two subsidiary corporations; and

(2) The peculiar status of the two corporations created hazards and problems by reason of the fact that the stock had been hypothecated by General Stores Corporation, which later came under reorganization proceedings, first under Chapter XI, which proved abortive,[1] and subsequently under the present proceeding of Chapter X.[2]

1. In re General Stores Corporation, D.C. S.D.N.Y.1955, 129 F.Supp. 801, affirmed 2 Cir., 1955, 222 F.2d 234, affirmed 1956, 350 U.S. 462, 76 S.Ct. 516, 100 L.Ed. 726.

2. In re General Stores Corporation, D.C. S.D.N.Y.1957, 147 F.Supp. 350; In re General Stores Corporation, D.C.S.D.N. Y.1957, 150 F.Supp. 868, affirmed Ruskin v. Griffiths, 2 Cir., 1958, 250 F.2d 875.

This court is not impressed with the argument that no executive connected with the two companies was capable of conducting the necessary supervision. Even if that were so, there is no substantial evidence to indicate that such an executive could not have been hired. Lewis J. Ruskin had been concerned in drug chains for many years. He had received a substantial amount in payment for what he sold. The indicated value of the collateral appears to have been adequate security. Much of his activity was spontaneous self-interest.

There was, in my opinion, nothing improper in Lewis J. Ruskin's acting as collateral trustee in spite of the fact that he was one of the persons who is a beneficiary thereof as a holder of one of the notes. General Stores Corporation had consented thereto in any event, and I fail to see anything invalid about such a relationship under these circumstances.

The valuation of such services depends primarily upon the following factors: (1) Were the services rendered in the execution of the trust? (2) What is the reasonable compensation therefor?

Certain of the expenses of the collateral trustee have already been paid directly or on his behalf by the subsidiaries.

The collateral trustee contends that the minimum value of his services must be based upon his salary as an executive of one of the subsidiary chains prior to the sale of May 19, 1954, when he received $35,000 to $40,000 a year. With this contention the court does not agree. Lewis J. Ruskin here served not as chief executive of a chain, but as a trustee of collateral—that is, the corporate stock of the subsidiaries.

Counsel for the Securities and Exchange Commission has asserted that the fair and reasonable value of the services rendered by the collateral trustee in the execution of his trust did not exceed $6,000 a year since the filing of the Chapter X proceeding (April 30, 1956) and that payment should be made only from that date (S.M. 4726). As already stated, however, default occurred on October 18, 1954. In the opinion of this court, the services of the collateral trustee to some extent contributed to the stabilization in management of the two subsidiaries concerned; in part the success of these corporations during the period in question came from attention which the collateral trustee's control effected; and during the period of reorganization under Chapter X this collateral trustee had certain increased responsibilities.

Consequently, it is my conclusion that the collateral trustee should be awarded compensation at the rate of $6,000 a year for the period from October 18, 1954, to April 30, 1956, and $9,000 a year for the period from May 1, 1956, to December 31, 1957.

Thus, therefore, when so computed, the collateral trustee is entitled to the following sums:

| | |
|---|---|
| October 18, 1954 to April 30, 1956 at $6,000 per annum ................... | $ 9,215.00 |
| May 1, 1956 to December 31, 1957 at $9,000 per annum ................... | $15,000.00 |
| Total ............ | $24,215.00 |

---

Petition of Lewis J. Ruskin as Collateral Trustee for Determination of the Amount of the Lien Upon the Collateral for Attorneys' Fees

Under the collateral agreement of May 19, 1954 (Exhibit F), above mentioned, Lewis J. Ruskin as collateral trustee asks for an allowance with which

to compensate attorneys. The relevant provision of this collateral agreement is Article VIII, Section 1, subdivision (3), which reads as follows:

"Section 1. The Trustee accepts the trust of this Collateral Agreement upon the following terms and conditions to which General and the holder and holders of the Notes secured hereby agree:

\* \* \* \* \* \*

"(3) The Trustee may employ agents, attorneys and counsel in the execution of said trusts, who may also be the attorneys and counsel of the holder or holders of said Notes, and of Ford and Stineway, or their successors, or any one or more of them, and the reasonable compensation of the Trustee's attorneys and counsel and of any other person as the Trustee may employ in the administration and management of the trusts hereunder, and all other reasonable expenses necessarily incurred or actually disbursed hereunder, General agrees to pay to the Trustee on demand; and for such payment, the Trustee shall have a lien on the Trust Estate, and on all funds in the hands of the Trustee, in priority to the rights and claims of the holder or holders of said Notes."

It is thus evident:

(1) That this subdivision provides for the employment of attorneys by the trustee;

(2) That these attorneys may also be the attorneys and counsel for the holder of the notes and for Ford Hopkins and Stineway;

(3) That the compensation must be reasonable.

The trustee seeks to recover compensation for two sets of attorneys, to wit, Ruskin & Rosenbaum of Chicago, Illinois, and Paul, Weiss, Rifkind, Wharton & Garrison of New York City. For services, the trustee seeks reimbursement to pay Ruskin & Rosenbaum the sum of $80,000, and Paul, Weiss, Rifkind, Whar-

ton & Garrison the sum of $100,000. No claim is made for any services prior to October 15, 1954. The default by filing the arrangement petition occurred on October 18, 1954.

Although the collateral trustee may be authorized to employ two or more attorneys if necessary, it has been held that the fact that two attorneys were employed does not mean that they should be allowed a fee twice as much as that to which a single attorney would be entitled. Specialty Products Co., Inc., v. Universal Industrial Corp., D.C.M.D.Pa. 1937, 21 F.Supp. 92, 94.

In general, these services related to the following matters:

(1) Arrangements with creditors to secure the delivery of merchandise immediately after the filing of the Chapter XI proceeding on October 18, 1954, when creditors were concerned;

(2) Preparation of notice of acceleration, matters connected with the Chapter XI proceeding and appeals therein;

(3) Conferences with Richard Goodman;

(4) Conferences with the reorganization trustee, Charles H. Griffiths, in the Chapter X proceeding;

(5) Preparation of proof of claim;

(6) Original motion to vacate stay of foreclosure (see In re General Stores Corporation, D.C., 147 F.Supp. 350);

(7) Second motion to vacate stay of foreclosure (see D.C., 150 F.Supp. 868);

(8) Opposition to and attempts to vacate order of restraint on the subsidiaries of July 1, 1957;

(9) Appeals from the order denying the vacation of the stay against foreclosure and order granting the restraint (see 2 Cir., 250 F.2d 875);

(10) Preparations for and attendance at plan hearings;

(11) Attending at hearings before bankruptcy referee in reference to the claim of Richard Goodman.

In opposition to this application the reorganization trustee and others ob-

jecting thereto point out, among other things, the following:

(1) *That there was certain duplication of services rendered by the New York and Chicago firms of attorneys involved.*

■ To some extent this is apparent. It is true that the subsidiaries involved were located in the Chicago area and that the reorganization proceedings took place in New York where the debtor, General Stores Corporation, had its office. Consequently, it was necessary to obtain factual information from Chicago in many instances. However, it is a well established principle that attorneys are not to be paid lawyers' fees for performing non-legal services. See Finn v. Childs Co., 2 Cir., 1950, 181 F.2d 431, 437. Many, if not all, of the facts required by the New York firm could have been obtained without an intermediary and directly through either Lewis J. Ruskin, the collateral trustee, or at his request through the officers or managers connected with the two subsidiaries. With the retainer by the collateral trustee of experienced counsel, such as that of the New York firm, the constant shuttling of papers (and Chicago counsel) back and forth appears to have been unnecessary. Moreover, a considerable part of the services allegedly rendered by Ruskin & Rosenbaum consisted of conferences between Rosenbaum and Harry H. Ruskin, or vice-versa, as the case may be. While, as indicated, undoubtedly a trustee is entitled to hire more than one attorney, the employment of a substantial firm with eminent counsel in New York hardly warrants duplicative advice or effort. The function of Ruskin & Rosenbaum for the most part appears to have been (1) securing information from the subsidiaries; (2) consulting with New York counsel; and (3) advising Lewis J. Ruskin of determinations and actions taken in New York.

■ The attendance by Harry H. Ruskin at the plan hearings and on the motions made to vacate the stay of foreclosure was unnecessary and, hence, unreasonable. The collateral trustee was represented by eminent counsel who usually was accompanied by one associate and one assistant. At times, Lewis J. Ruskin, the collateral trustee, and officers of the subsidiaries were also present.

Duplication deserves careful consideration in the fixing of fees. Wasteful labor should not bring compensation. Finn v. Childs Co., 2 Cir., 1950, 181 F.2d 431, 436; Newman & Bisco v. Real Associates Securities Corp., 2 Cir., 1949, 173 F.2d 609.

(2) *That certain of the services rendered related to matters as to which legal action or advice by the collateral trustee's counsel was unnecessary.*

■ Again, to some extent, I must agree with this contention. Richard Goodman purchased or caused to be purchased various shares of stock of the debtor and various claims against the debtor. The collateral trustee through his attorneys at all times claimed that the debt owed to the noteholders was prior to that of all other claimants insofar as security in the collateral was concerned. This was disputed by no one. The fact that there were certain questions raised by the reorganization trustee with regard to the purchase of the Goodman claims, which had been acquired at a discount, and which may have related to effects on other creditors in no way involved the secured creditors. Consequently, the claim for any legal services and attendance before the bankruptcy referee at the time of the Goodman hearing is without foundation. Mere participation never creates a right to compensation. Milbank, Tweed & Hope v. McCue, 4 Cir., 1940, 111 F.2d 100, 101; In re Paramount Publix Corporation, 2 Cir., 1936, 85 F.2d 588.

Although the secured creditors cannot be criticized for a reasonable effort to collect their claim, the motion made to vacate the stay of foreclosure was in fact premature. The repetition of such motion and the appeal therefrom were of questionable necessity or value. See Ruskin v. Griffiths, 2 Cir., 1958, 250 F.2d 875. The collateral trustee and his at-

torneys proceeded with the appeal in spite of the fact that the plan of reorganization, even as originally submitted, provided for full payment, although deferring a portion thereof; that the substantial collateral available was worth much more than the amount of the extended credit when the initial motion was made. The amended plan provided for payment in full in cash on consummation of the plan. This court must consider such factors in connection with the evaluation of claims for attorneys' fees herein made.

(3) *That Ruskin & Rosenbaum during the period for which compensation is sought for them by the collateral trustee were receiving an annual retainer of $15,000 from Ford Hopkins.*

Some of the services related to Ford Hopkins and affected the subsidiaries directly rather than the collateral trustee. Although not substantial, this is a factor to be considered.

(4) *That the negotiations, particularly in the beginning of the initial phases thereof with Richard Goodman, were not such services as the collateral trustee necessarily required or for which he may properly be compensated in the hiring of counsel.*

For the most part, at least prior to the submission of the Goodman plan in the Chapter X proceeding, these negotiations largely related to the proposed transfer of the notes from Lewis J. Ruskin and Rexall to Goodman. The fact that at times Lewis J. Ruskin, an experienced business man who lived in Scottsdale, Arizona, may have chosen to delegate personal business negotiations to his brother, Harry H. Ruskin, an attorney, is not sufficient to warrant substantial payment here.

(5) *That the issues involved were not complex.*

The objectants pointedly and correctly assert that the chief issue involving the secured creditors, and, hence, the collateral trustee, was the collection of their claim. The collateral trustee at all times asserted an absolute right to an "in-dubitable equivalent," namely, payment in full in cash on the line without deferment. If such a right existed, it may have been imperative but it was not complex. There is inadequate proof to indicate that the extensive time involved in preparing lengthy briefs was necessary for the protection of the collateral trustee and his trust, especially at a time when there had been no determination by this court that the plan presented was worthy of consideration.

The collateral trustee avers that the strategic and persistent opposition of his counsel was responsible for the results ultimately obtained. In the opinion of this court, this is not entirely correct. Some credit must be allotted to the reorganization trustee and to other factors.

Ruskin & Rosenbaum submit a time statement between October 15, 1954, and December 13, 1957, totalling 1,895 hours. This firm asks for $80,000. As already mentioned, a certain amount of time was in conferences between Rosenbaum and Harry H. Ruskin, perhaps 250 hours. What was in fact accomplished in these conferences is somewhat obscure. Some of it appears to be duplication of work done by the New York firm; parts of the work of Ruskin & Rosenbaum appear to have been in effect acting as a fact-acquiring medium between the New York firm and the subsidiaries; other parts appear to be concerned with trips to New York and unnecessary court appearances accompanying counsel who represented the collateral trustee; some of the services, as already indicated, appear to have been more directly concerned with the subsidiaries and for which the Chicago firm was receiving an annual retainer. It may be noted that active participation in court by Harry H. Ruskin began only when this court was considering these allowances and interest.

The New York firm, seeking payment of $100,000, set forth a time schedule of some 2,031 hours. Of this amount, the services of the chief counsel for the collateral trustee involved at least 265 hours, while the remainder was contributed by a partner in the amount of 58 hours, by

another associate or partner in the amount of 664 hours, and approximately one-half was that of a junior associate of three-years' experience, who spent some 1,026 hours. As already indicated: (1) Certain of the so-called "services" were definitely unnecessary; (2) Portions, at least, of the services rendered were of dubious necessity at the time rendered; (3) Certain duplication or overlapping occurred.

Attorneys' fees cannot be fixed with mathematical certainty. Calhoun v. Stratton, 6 Cir., 1932, 61 F.2d 302, 303. We are left only with a measure termed "reasonable." Sampsell v. Monell, 9 Cir., 1947, 162 F.2d 4, 6. The following elements as matters properly to be considered, when fees of an attorney are to be fixed, were approved by Judge Woolsey when a member of this court:

"* * * (1) The time which has fairly and properly to be used in dealing with the case; because this represents the amount of work necessary. (2) The quality of skill which the situation facing the attorney demanded. (3) The skill employed in meeting that situation. (4) The amount involved; because that determines the risk of the client and the commensurate responsibility of the lawyer. (5) The result of the case, because that determines the real benefit to the client. (6) The eminence of the lawyer at the bar, or in the specialty in which he may be practicing." In re Osofsky, D.C. S.D.N.Y.1931, 50 F.2d 925, 927.

The mere expenditure of time is not controlling either as a ceiling or as a floor. The compensation of a lawyer cannot necessarily be fixed by the time he was actually engaged. Adair Lumber Co. v. Atchison T. & S. F. Ry. Co., D.C. W.D.Mo.1937, 19 F.Supp. 415, 417. The value of a lawyer's services is not measured by time or labor merely. Woodbury v. Andrew Jergens Co., D.C.S.D.N.Y. 1930, 37 F.2d 749, 750. It is evident that the time must be fairly and properly used.

"* * * One thousand plodding hours may be far less productive than one imaginative, brilliant hour. * * * when hours become a criterion, economy of time may cease to be a virtue. * * *" George D. Hornstein, "Legal Therapeutics: The 'Salvage' Factor in Counsel Fee Awards," 69 Harvard Law Review, 658, 660 (1956).

The quality of skill required was not unusual. There were no extraordinary features; there was one central legal problem—whether the secured creditors were entitled of right to be paid in cash at once or whether $670,000 could be deferred over a period of five or six years. The differential could by no means exceed this accomplishment.

The fact that approximately half of the recorded time spent by the New York firm was contributed by a junior associate must be weighed. Finn v. Childs Co., 2 Cir., 1950, 181 F.2d 431, 437.

Here, we are concerned with a trust in which the fundamental premise on which the allowance is made must be based upon what is fair and reasonable under the circumstances of the particular case. The necessity of the services depends in the first instance upon whether or not the proceedings initiated were reasonably essential to the protection of the trust. The amount allowed should bear a reasonable relationship to the demands of the situation.

Between October 15, 1954, and April 30, 1956, the firm of Ruskin & Rosenbaum were the only attorneys acting for the collateral trustee. The New York firm was not engaged until about April 30, 1956. The services rendered by Ruskin & Rosenbaum in the period above mentioned included:

(1) Conferences of Harry H. Ruskin with Marks F. Paskes of Otterbourg, Steindler, Houston & Rosen in reference to General Stores filing a Chapter XI petition;

(2) Preparation and drafts, redrafts and revisions of a so-called "forebear-

ance agreement" or "standby agreement;" conferences in reference to the same with Paskes and Rosen of the Otterbourg firm, Lewis J. Ruskin, Rexall, Catchings of General Stores; conference with Clark Earle of General Stores;

(3) Conferences in respect to requests of Ford Hopkins suppliers growing out of the filing of the Chapter XI proceeding;

(4) Conferences in regard to matters relating to the Chapter X proceeding after filing, including the Shlensky application;

(5) Conferences with the collateral trustee with regard to closing certain stores of General Stores;

(6) Extension of the "standby agreement;"

(7) Investigation of law with respect to possible Chapter X status;

(8) Conferences with Paskes in respect to appeals to the Court of Appeals, Second Circuit, from the determination of Judge Dimock of the United States District Court, Southern District of New York, and with respect to the appeal to the Supreme Court from the determination of the Second Circuit;

(9) Miscellaneous services.

The Securities and Exchange Commission recommends that Ruskin & Rosenbaum for these services in this period be awarded the sum of $5,000.

As to the period between May 1, 1956, and December 31, 1957, the Securities and Exchange Commission recommends the sum of $55,000 for the joint services of the two law firms. It is the conclusion of the court that a joint award is the only feasible approach. Both firms participated. Their services were mingled. To attempt a separate appraisal is impractical.

In Scribner & Miller v. Conway, 2 Cir., 1956, 238 F.2d 905, the Court of Appeals of this circuit made it clear that recommendations of the Securities and Exchange Commission with respect to allowances in reorganization are entitled to the greatest weight. The court in a per curiam opinion there stated:

"In Finn v. Childs Co., supra, 2 Cir., 181 F.2d 431, we held under the circumstances there disclosed that the recommendation for allowances of the S. E. C., made by this responsible and disinterested public agency after close familiarity with the entire proceedings and careful study and report, should be followed unless the reorganization judge showed reasons otherwise based on specific findings. See also In re Solar Mfg. Corp., 3 Cir., 215 F.2d 555. * * *". (at page 907.)

The facts of the present case demonstrate that the allowances which are now sought in this proceeding are predominantly reorganizational allowances. The claims which form the basis of this application grow out of the filing of the debtor's petition for reorganization in Chapter XI on October 18, 1954. The services for which the collateral trustee requests payment and the expenses for legal services for which he seeks reimbursement relate in one way or another to the Chapter XI and Chapter X reorganization proceedings.

Under the provisions of the plan of reorganization as approved by order of this court dated May 21, 1958, as I have previously intimated, Richard Goodman or his nominees agree to invest in the company a minimum of $1,100,000 in cash, for which he or his nominees are to receive shares of common stock at $1 per share. See Plan, Article III, Section B.3. Moreover, any deficiency in funds needed to consummate the plan is to be advanced by Goodman, for which he will receive new common stock at the price of $1 per share. See Plan, Article III, Section D.

Consequently, although the claim of the collateral trustee may be contractual in origin, the payment of disbursements of the collateral trustee for attorneys' fees affects the debtor in this reorganization as fully as if there were a sale and

**148**

liquidation in bankruptcy. Any increase in payment of this claim results in the issuance of more common stock (to Goodman) with some consequent dilution of the holdings of the other stockholders. Creditors who accept notes are also affected by this capital structure.

It has been held by an eminent member of the Court of Appeals of the Second Circuit, when sitting as a district judge, that the fact that a lien may be contractually based does not alter the fact that the fixation of the value is a reorganizational function. See In re New York, New Haven & Hartford Railroad Company, D.C.D.Conn.1942, 46 F.Supp. 236, 239 (opinion by Hincks, J.).

In Finn v. Childs Co., 2 Cir., 1950, 181 F.2d 431, the present Chief Judge, Clark, stated:

"* * * We have often been admonished by the Supreme Court that in allowances of this sort we must avoid 'vicarious generosity,' In re Gilbert, 276 U.S. 294, 48 S.Ct. 309, 72 L.Ed. 580, and that 'the desire to reduce the cost of reorganization [was] one of the controlling reasons for the enactment' of the bankruptcy statutes. Callaghan v. Reconstruction Finance Corp., 297 U.S. 464, 469, 56 S.Ct. 519, 521, 80 L.Ed. 804; Realty Associates Securities Corp. v. O'Connor, 295 U.S. 295, 299, 55 S.Ct. 663, 79 L.Ed. 1446; Dickinson Industrial Site, Inc., v. Cowan, 309 U.S. 382, 388, 60 S.Ct. 595, 84 L.Ed. 819; Brown v. Gerdes, 321 U.S. 178, 181–182, 64 S.Ct. 487, 88 L.Ed. 659; In re New York Investors, 2 Cir., 79 F.2d 182, 185, certiorari denied Endelman v. Reconstruction Finance Corp., 296 U.S. 649, 56 S.Ct. 308, 80 L.Ed. 462. * * *" (at page 435.)

■ After a careful, independent consideration of the facts, examination of the affidavits and statements of the collateral trustee and his attorneys, and after reviewing the minutes, exhibits, briefs, motions, appeals and proceedings involved herein, this court is of the opinion that the sum of $5,000 is a fair, reasonable and adequate sum for allowance to the collateral trustee for payment of the firm of Ruskin & Rosenbaum for the period between October 15, 1954, and April 30, 1956, and that the sum of $55,000 is a fair, reasonable and adequate sum to be awarded to the said collateral trustee for payment for the combined services of Ruskin & Rosenbaum and Paul, Weiss, Rifkind, Wharton & Garrison for the period from on or about April 30, 1956, to December 15, 1957. Consequently, it is so found by this court. Any allowance to the collateral trustee for similar expenses after December 15, 1957, must be modest.

### Claim of Collateral Trustee for Disbursements

Lewis J. Ruskin, collateral trustee, in addition to compensation for services of counsel, also seeks to have his account settled with respect to disbursements which he allegedly made or incurred pursuant to the collateral agreement. The original account submitted with the petition as Secured Creditors' Exhibit AAA, verified December 12, 1957, was amended, at the direction of the court, on March 6, 1958, and this amendment was received by this court on March 11, 1958.

The following items of this account as amended are disallowed for the reasons hereinafter stated:

(1) Disbursements in the amount of $156.11 to Ruskin & Rosenbaum for the period of December 6, 1956, to December 7, 1956.

From the original petition of Lewis J. Ruskin and the affidavit of Harry H. Ruskin thereto attached, it appears that these disbursements are for Harry H. Ruskin's trip to New York. The main purpose of this trip was a conference with members of the Rifkind firm and to appear in court on a motion to vacate the restraining order. I do not believe this trip was necessary on the part of Harry H. Ruskin at that time.

(2) Certain bills of the New York attorneys for disbursements entitled "Overtime and related expenses," are as follows:

(a) April 25, 1956 through December 31, 1956.............$188.93

(b) January 1, 1957 through May 31, 1957 ................$163.83

(c) June 1, 1957 through November 30, 1957 .............$290.48

———◆———

There is no proof in this record of any necessity for overtime. No application was made at any time by the collateral trustee or his attorneys for adjournment of any motion. No reasons for haste existed. If they did exist they were created solely by the collateral trustee. Accordingly, these items are disallowed.

(3) The collateral trustee asks allowance for payment to the New York firm in the period from June 1, 1957, to November 30, 1957, of $183.15 for meals. This item is disallowed.

(4) Item of February 7, 1957, to February 8, 1957, paid to Ruskin & Rosenbaum for expenses in connection with a trip to New York in the amount of $159.76, is disallowed.

This trip appears to have been made for the main object of attending the continued hearings on the Goodman objections. As elsewhere herein indicated, the collateral trustee had no stake in that matter. This was unnecessary and, therefore, is disallowed.

(5) Item dated February 18, 1957, to February 20, 1957, paid to Ruskin & Rosenbaum in the total amount of $300.-46, is reduced as follows:

(a) $188.54 for round trip airplane fare of Harry H. Ruskin and J. Rosenbaum is reduced one-half to ...................$ 94.27

(b) $71.56 for hotel bill is likewise reduced by one-half to ....$ 35.78,

making a total reduction in this item of ...................$130.05,

and, therefore, allowed at ...............................$170.41 instead of $300.46. In my opinion, Mr. Rosenbaum's attendance with Mr. Ruskin was wholly unnecessary.

———◆———

(6) Payment to Lewis J. Ruskin for trustee's expenses covering hotel during New York hearing, June 16, 1957, to June 25, 1957, in the amount of $645.89, is reduced to $300.

(7) Standard Research Consultants, Inc. The original bill of Standard Research Consultants, Inc. ($11,211.79), although generous, is allowed. The subsequent bill for a total of $7,786.74 is reduced to $2,708.47. The collateral trustee produced no proof from any source as to the value of Standard's services or even proof that Standard performed services as billed. The collateral trustee made no investigation to check the bill of Standard, which investigation, it appears to me, he was duty-bound to make.

(8) The collateral trustee is allowed the cost of one transcript, but not two. No necessity for two is shown. The cost

of the transcript in the amount of $106.50 of the Goodman hearing before the referee is disallowed.

Consequently, as settled, the disbursement account of the collateral trustee is allowed as follows:

The trustee, as shown in the amended accounting of March 10, 1958, is charged with the sum of ............................... $22,456.28

He sought credit for expenses paid of ................. $19,970.29

He is allowed ............................ $18,399.87

He seeks credit for unpaid bills rendered of ................. $ 9,716.13

He is allowed ............................ $ 3,971.49   $22,371.36

Thus, he is charged with a net amount of ................. $    84.92

---

The alleged counterclaim and set-off set forth for the benefit of the debtor as against Lewis J. Ruskin, individually and as collateral trustee, under Par. (47) of Richard Goodman's answer of January 24, 1958, are dismissed.

The secured creditors are entitled to a lien for the balance of principal in the sum of $2,050,000.00 and interest thereon at the rate of 4% to the date of payment.

In accordance with this opinion, therefore, the amount of the lien of the collateral trustee is as follows:

For services of Lewis J. Ruskin, collateral trustee ... $24,215.00

The collateral trustee is charged with the sum of $84.-92 in accordance with the account for disbursements and expenses as hereinbefore stated.

For allowance to the collateral trustee for services of Ruskin & Rosenbaum from October 15, 1954 to April 30, 1956 ..................... $ 5,000.00

For allowance to the collateral trustee for the joint services of Ruskin & Rosenbaum and Paul, Weiss, Rifkind, Wharton & Garrison for the period from on or about April 30, 1956 to December 15, 1957 ..................... $55,000.00

The foregoing is intended to encompass Findings of Fact and Conclusions of Law.

Settle order on notice.